UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.: 95-20169 (AMN) |
| NERI BROS. CONSTRUCTION CORP., | : | Chapter 7 |
| *Debtor* | : | |
| | : | |
| | : | |
| JOHN J. O'NEIL, CHAPTER 7 | : | |
| TRUSTEE, | : | Adv. Pro. No. 97-02012 (AMN) |
| *Plaintiff* | : | |
| v. | : | |
| NEW ENGLAND ROAD, INC., | : | |
| JOHN NERI, HELEN NERI, | : | |
| HELEN NERI, IN HER CAPACITY AS | : | |
| EXECUTRIX OF THE ESTATE OF | : | |
| ALAN NERI, SR., ALAN NERI, JR. | : | |
| *Defendants* | : | |
| | : | |
| | : | |
| NEW ENGLAND ROAD, INC. | : | |
| *Counterclaim Plaintiff* | : | |
| v. | : | |
| JOHN J. O'NEIL, CHAPTER 7 | : | |
| TRUSTEE, | : | |
| *Counterclaim Defendant* | : | Re: ECF No. 164, 322 |

## <u>MEMORANDUM OF DECISION AFTER TRIAL</u>

### APPEARANCES

| | |
|---|---|
| Irve J. Goldman, Esq. | *Counsel for the Plaintiff and* |
| Jessica Grossarth Kennedy, Esq. | *Counterclaim Defendant* |
| Pullman & Comley | |
| 850 Main Street | |
| P.O. Box 7006 | |
| Bridgeport, CT 06601 | |
| | |
| Paul N. Gilmore, Esq. | *Counsel for the Defendants* |
| Thomas A. Gugliotti, Esq. | *and Counterclaim Plaintiff* |
| Updike, Kelly & Spellacy | |
| 100 Pearl Street | |
| P.O. Box 231277 | |
| Hartford, CT 06123 | |

# TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND............................................................................. 1
JURISDICTION .......................................................................................................... 3
TRUSTEE'S CLAIMS AGAINST .................................................................................... 4
THE DEFENDANTS AND DEFENDANT'S COUNTERCLAIMS .................................... 4
FINDINGS OF FACT.................................................................................................. 8
   Neri Bros. Construction Corp: A Family Company ...................................... 8
   Rival Companies Formed ............................................................................. 9
   1992 State Court Lawsuit:  Alan Sr. v. Carl ................................................ 12
   Condition of the Debtor from 1991 to Petition Date .................................... 15
   Inability to Obtain Bonding .......................................................................... 15
   The Debtor's Financial Condition ................................................................ 20
   Johnson's Summary of the Debtor's .......................................................... 24
   Financial Condition Versus Increasing Caciopoli Debt................................ 24
   Rental Agreements Between NE Road and the Debtor .............................. 25
   Authorization for Agreements...................................................................... 25
   Who Knew NE Road Existed and Would be Renting from the Debtor? ...... 26
   Negotiating Rental Rates between the Debtor and NE Road...................... 27
   Existence of Any Writing Memorializing Agreement.................................... 28
   Equipment Use ........................................................................................... 29
   Calculating Reasonably Equivalent Value................................................... 33
   Comparative Rental Agreements ................................................................ 39
   Neri Corp.'s Rentals From The Debtor........................................................ 41
   Other Evidence of Rental Rates.................................................................. 43
   Use of the Debtor's Supplies at No Charge ............................................... 44
   The Debtor/C&A Development Default on Premises Rental from Shoreline............. 48
   The Debtor Files for Bankruptcy ................................................................ 49
   The Auction................................................................................................. 50
EVIDENTIARY RULINGS ......................................................................................... 52
   The DeMaria Deposition ............................................................................ 52
DISCUSSION........................................................................................................... 54
   Counts I and II: Overview of Constructive and Intentional Fraudulent Transfers ....... 54
   Count I. Constructive Fraudulent Transfer ................................................. 58
   Count II:  Intentional Fraudulent Transfer................................................... 68
   Count III: Unauthorized Post-Petition Transfers......................................... 73
   Count IV: Unjust Enrichment....................................................................... 76
   Count V: Improper Diversion of Corporate Opportunities........................... 79
   Count VI: Breach of Fiduciary Duty ............................................................ 84
   Count VII: Disregard of the Corporate Veil................................................. 87
   Count VIII: Participation in Breach of Fiduciary Duty ................................. 89
   Counterclaim for Administrative Expense ................................................... 92
   Compensatory Damages ............................................................................ 95
   Punitive Damages ...................................................................................... 96
CONCLUSION ......................................................................................................... 96

## INTRODUCTION AND BACKGROUND

After a trial held during the Summer of 2010, this Memorandum of Decision will

enter more than twenty-one (21) years after this adversary proceeding commenced in

1997.  The bankruptcy trustee's claims resolved through this decision have their roots in

a bitter, decades-old dispute between members of the Neri family regarding the

ownership and control of the bankruptcy debtor, Neri Bros. Construction Corp.

("Debtor"), its business opportunities, and its equipment assets.

By the late 1980s, the Debtor was run primarily by three brothers – Alan Neri, Sr.,

Carl Neri ("Carl") and John ("John") Neri.  This litigation continues to ensnare the Neri

family both through this adversary proceeding and through ongoing battles over the

proofs of claim of various Neri family members in the underlying Chapter 7 case that

form the vast majority of the debt in the Debtor's twenty-three year old bankruptcy case.

The underlying bankruptcy case was filed on January 17, 1995 (the "Petition

Date"), and started as a Chapter 11 reorganization case, case number 95-20169 (the

"Main Case").  Chapter 11 debtors are meant to use the breathing spell provided by the

automatic stay to formulate and propose a plan of reorganization to resolve their pre-

petition debt.  Here, the voluntary bankruptcy petition was signed by Alan Neri, Sr.

Within two months after the Petition Date, Carl and his side of the Neri family

challenged Alan Neri, Sr.'s control of the Chapter 11 process by filing a motion to

appoint a Chapter 11 Trustee.  On October 31, 1995, after several days of testimony

spread over several months, the Bankruptcy Court Judge (Krechevsky, J.) appointed

Alan Sibarium ("Trustee Sibarium") to be a Chapter 11 trustee – thus replacing the

management authority of Alan Neri, Sr. – to run the Debtor's business.

Almost nine months later, on July 13, 1996, Trustee Sibarium conducted a court-authorized auction pursuant to 11 U.S.C. § 363 (the "Auction") that liquidated the Debtor's construction equipment and other personal property, generating $341,915.00 in proceeds.  ECF No. 136; Exh. W.  Several months after that, in January 1997, Trustee Sibarium commenced this adversary proceeding against four defendants:  New England Road, Inc. ("NE Road"), Alan Neri, Sr., Alan Neri, Jr. ("Alan Jr."), and Helen Neri ("Helen").  John was added as a defendant later on, and Helen Neri was substituted for defendant Alan Neri, Sr. in her role as Executrix of his estate after his death ("Alan Sr.").  The complaint sought damages for NE Road's use of the Debtor's equipment prior to and during the early stages of the Main Case and for damages due to NE Road's usurpation of the Debtor's corporate opportunities.  On September 12, 1997, Trustee Sibarium filed a motion to convert the Main Case from one under Chapter 11 to a Chapter 7 case, which the Court granted on October 14, 1997. ECF Nos. 203, 211.

Upon conversion of the case to Chapter 7, John J. O'Neil was appointed as the Chapter 7 Trustee (the "Trustee") in the Main Case and he then became the plaintiff in this adversary proceeding.  This adversary proceeding was initiated before Bankruptcy Judge Robert L. Krechevsky, tried before Bankruptcy Judge Albert S. Dabrowski, and is now decided by a third bankruptcy judge.

While there were sporadic efforts to resolve this case -- including requests that the Court defer its decision from time to time while settlement discussions were proceeding – delays also occurred because of the change of judicial officers over time and efforts starting in late 2017 by new counsel for the defendants to the reopen the

evidentiary record.[1] One of the company's founding brothers and a defendant here –

Alan Neri, Sr. – passed away in 2008, before trial, as did the original Bankruptcy Judge,

the Honorable Robert L. Krechevsky.

For the Trustee John J. O'Neil and the remaining Neri family members –

particularly the families of Alan Sr. and Carl – there is little doubt this decision will be

unsatisfactory to some or all of the parties, in no small part because of the extraordinary

amount of time that has passed.

## **JURISDICTION**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 1334(b) and 157(b), and the District Court's Order of referral of bankruptcy matters,

dated September 21, 1984.  This adversary proceeding is a core proceeding pursuant

to 28 U.S.C. §§ 157(b)(2)(A)(matters concerning the administration of the estate) and

(H)(proceedings to determine or recover fraudulent conveyances) regarding Counts I, II

and III, seeking recovery of fraudulent conveyances and unauthorized post-petition

transfers, and is a non-core proceeding related to a case under Title 11, United States

Code, pursuant to 28 U.S.C. § 157(c) regarding Counts IV, V, VI, VII, and VIII.  The

parties are aware they may seek a final judgment from a United States District Judge

regarding Counts IV, V, VI, VII, and VIII.  However, the parties have consented to the

entry of final orders or judgment by a United States Bankruptcy Judge, subject to

traditional appeal rights.[2]  *See* Fed.R.Bankr.P. 7008 and 7012(b); 28 U.S.C. § 157;

---

[1]      A separate order will enter denying the Defendants' Motion for Permission to Reopen the
Evidentiary Record. AP-ECF No. 368.
[2]      Should any reviewing Court disagree with this application of the law and Fed.R.Bankr.P. 7008
and 7012(b)(modified since this case commenced), then this Memorandum of Decision shall constitute
the undersigned United States Bankruptcy Judge's recommended ruling including findings of fact and
conclusions of law.

3

*Wellness Intern. Network, Ltd. V. Sharif*, 135 S.Ct. 1932, 1947–48 (2015); AP-ECF No.

317; AP-ECF[3] No. 339, June 1, 2016 Tr., pp. 4-5.

This adversary proceeding arose under the Main Case pending in this District;

therefore, venue is proper in this District pursuant to 28 U.S.C. § 1409.  The plaintiff has

standing to seek the relief sought in the complaint because, as the duly appointed

Chapter 7 Trustee, pursuant to 11 U.S.C. § 323, he may "prosecute any action or

proceeding in behalf of the estate before any tribunal."  Fed.R.Bankr.P. 6009.

Pursuant to Fed.R.Civ.P. 63, made applicable here through Fed.R.Bankr.P.

9028, the undersigned United States Bankruptcy Judge has certified[4] that she fully

reviewed the record of the trial, of the adversary proceeding and the underlying

bankruptcy case, and has determined that the case may be completed without prejudice

to the parties.[5]  Pursuant to Fed.R.Civ.P. 63, the parties were provided with an

opportunity to request that any witness be recalled, and no such request was made.

## TRUSTEE'S CLAIMS AGAINST
## THE DEFENDANTS AND DEFENDANT'S COUNTERCLAIMS

The Trustee sought to recover damages from NE Road based on two basic

theories:

(1)     NE Road used or rented the Debtor's construction equipment and paid an
        unfairly low rental rate, resulting in damages owed to the Debtor's
        bankruptcy estate.

(2)     NE Road unfairly took advantage of business opportunities in the
        construction industry that, in truth, belonged to the Debtor, thereby

---

[3]     Citations to the docket in Case No. 95-20169 are noted by "ECF No."  Citations to the docket of
Adversary Proceeding No. 97-2012, are noted by "AP-ECF No."

[4]     A separate certification pursuant to Fed.R.Bankr.P. 9028 will be entered on the docket.

[5]     The Court notes that the audio file and transcript of a hearing held in the Main Case in September
1995, is no longer available for the deciding bankruptcy judge to review.  Upon investigation by the
Clerk's Office, it appears the audio file was destroyed in error in 2008, and no transcript is available.  The
presiding judge at the time, United States Bankruptcy Judge Robert L. Krechecvsky, directed the
appointment of a Chapter 11 trustee after the hearing.

diverting income away from the Debtor resulting in damages owed to the Debtor's bankruptcy estate.

The Trustee's Third Amended Complaint, AP-ECF No. 164, included nine counts, of which eight remain pending, that are generally summarized in the following table.[6]

| Count | Defendant | Cause of Action |
|-------|-----------|-----------------|
| I | NE Road | Constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b), Conn. Gen. Stat. §§ 52-552e(2) and 52-552f(a) |
| II | NE Road | Intentional fraudulent transfer pursuant to 11 U.S.C. § 544(b) and Conn. Gen. Stat. § 52-552e(a)(1) |
| III | NE Road | Unauthorized post-petition transfers pursuant to 11 U.S.C. § 549(a) |
| IV | NE Road | Unjust enrichment |
| V | NE Road, Alan Sr., Alan Jr., and John | Improper diversion of corporate opportunities |
| VI | Alan Sr., Alan Jr., and John | Breach of fiduciary duty |
| VII | Alan Sr., Alan Jr., John and NE Road | Disregard of the corporate veil |
| VIII | Alan Jr., John, and Helen | Participation in breach of fiduciary duty |

The defendants, NE Road, Alan Sr., Alan Jr., John, and Helen (the "Defendants") filed answers with affirmative defenses that are summarized in the following table.  AP-ECF Nos. 258, 259, 260, 261, 263.

| Affirmative Defense | Defendants Raising | Counts Asserted Applicable[7] |
|---------------------|--------------------|-------------------------------|
| Lack of standing based on the *in pari delicto* doctrine | Alan Sr., Alan Jr., John, and Helen | I, II, IV–VIII |

---

[6]     Alan Sr. withdrew his proof of claim with prejudice; rendering Count IX moot.  AP-ECF No. 248.

[7]     Certain Defendants have asserted that their affirmative defenses apply to various counts, notwithstanding that those counts are not directed at them.

| Failure to state a claim upon which relief can be granted (Fed.R.Bankr.P. 7012 and Fed.R.Civ.P. 12(b)(6)) | Alan Sr., Alan Jr., John, and Helen | I-VIII |
|---|---|---|

NE Road's answer also included five counterclaims but its post-trial briefing only addressed Counterclaim V, a claim for administrative expenses pursuant to 11 U.S.C. §§ 503(a) and 503(b)(1) based on the Debtor's rental of NE Road's real and personal property post-petition, and use of NE Road's real property, labor, and materials for the Auction. AP-ECF No. 261. Counterclaims I through IV are deemed abandoned by NE Road because they were not addressed in post-trial briefing.[8]

The Defendants filed a motion to dismiss the complaint[9] on December 3, 2004, pursuant to their *Wagoner* rule defense. AP-ECF No. 112. Judge Krechevsky denied the motion on March 11, 2005. AP-ECF No. 127.[10]

Bankruptcy Judge Albert S. Dabrowski (now retired) heard testimony over eight days during the period from May 11, 2010 through September 28, 2010, from the following witnesses:

---

[8]    It is well settled that a failure to brief an issue is grounds to deem the claim abandoned. *See United States v. Livecchi*, 605 F. Supp. 2d 437, 451 (W.D.N.Y. 2009), *aff'd*, 711 F.3d 345 (2d Cir. 2013)(dismissing second counterclaim where post-trial brief contains no discussion of claim); *Ansell v. D'Alesio*, 485 F.Supp.2d 80, 86 (D.Conn. 2007) (stating that where the plaintiffs did not address their equal protection claim in their opposition, "the Court will deem Plaintiffs to have waived their equal protection claim."); *Lami v. Stahl*, No. 3:05CV1416 (MRK), 2007 WL 3124834, at *1 (D.Conn. October 25, 2007) (concluding the court was fully justified in finding that Ms. Lami had waived her retaliation claim when she failed to include it in summary judgment briefs*); Desiderio v. Celebrity Cruise Lines, Inc.*, 1999 WL 440775, *3 (S.D.N.Y.1999) (finding claim abandoned where plaintiff's post-trial submissions included no proposed findings of fact or conclusions of law on such claim).

[9]    The Defendants sought to dismiss Counts III, IV, V, VI, and VII of the Trustee's Second Amended Complaint, which correspond to Counts IV–VIII of the Third Amended Complaint. *See*, AP-ECF Nos. 39, 112, 164.

[10]    The grounds for Judge Krechevsky's denial of the Motion to Dismiss appear unchanged after trial. *O'Neil v. New England Road, Inc. (In Re. Neri Bros. Construction Corp.)*, 323 B.R. 540 (Bankr. D. Conn. 2005). The evidence presented indicates that Carl was an "innocent" shareholder of the Debtor and was unaware of the full details of the conduct of Alan Sr. and Alan Jr. Accordingly, the Court concludes the Defendants' defense pursuant to the *Wagoner* Rule fails consistent with Judge Krechevsky's decision.

- Alan Neri, Sr., through the reading of prior deposition testimony. *See,* AP-ECF No. 278.

- Kimberly Neri Simoncini ("Kim"), Carl Neri's daughter.

- David Doyle, an Attorney for Dominic Caciopoli at the time of the trial and a former attorney for Carl Neri.

- Alan Neri, Jr., Alan Sr.'s son.

- Dominic Caciopoli, Carl Neri's former attorney.

- Helen Neri, Alan Neri, Sr.'s widow, a former employee of the Debtor, a stockholder of the defendant NE Road.

- Judith Wood, a researcher hired by the Trustee to track equipment usage.

- Carl Neri, Alan Sr.'s brother, co-founder of the Debtor.

- Richard Finkel, an accountant hired by the Trustee.

- Vincent A. Neri (Vincent), Carl's son.

- Mark Sheptoff, the Debtor's accountant during 1990 and 1991.

- Edwin L. Doernberger, an attorney for Carl.

- Kevin D. Smith, a researcher hired by the Trustee to evaluate the rental rates for equipment.

- Donna Leigt, office manager for Neri Corp. (a separate corporation established by Carl).

- Robert Mirto, a former attorney for the Debtor.

- David Johnson, an accountant for the Debtor from 1992 to 1994 and NE Road from 1993 to the time of trial.

- Tom Farace, owner of a trucking company.

- Lawrence Casler, owner of a heavy construction equipment company.

- Gerald Bugg, president of Shoreline Concrete.

- Anthony DeMaria, the Debtor's primary bonding agent who at the time of trial was suffering from severe Parkinson's Disease and testified via trial deposition with evidentiary objections reserved for the Court's decision here.  AP-ECF No. 282, p. 5; AP-ECF No. 293; Exh. 150.

In addition to testimony, the evidence before the Court included voluminous

exhibits, consisting of court records from other litigation involving the parties, records of

the Debtor and NE Road, reports created by Judith Wood ("Wood") and Kevin D. Smith
("Smith"), information regarding standards for rental rates, discovery responses, and
sundry other evidence.  Following the conclusion of the evidence, the parties filed post-
trial briefs and reply briefs.  AP-ECF Nos.  296, 297, 298, 299, 300 322, 327, 354, 328,
352, 362.

### FINDINGS OF FACT

### *Neri Bros. Construction Corp: A Family Company*

In approximately 1967, three Neri brothers, Alan Sr., Carl, and John, founded the
Debtor, Neri Bros. Construction Corp., as a family construction business that worked on
private construction jobs.  AP-ECF No. 277, p. 76; AP-ECF No. 281, p. 89.  The Debtor
transitioned to a bonded construction company performing public construction projects
for the State of Connecticut (the "State") by the mid- to late 1980s.  AP-ECF No. 277, p.
76.  Alan Sr. was the president of the corporation.  According to Carl, Alan Sr. ran
"some of the field" and worked repairing equipment while Carl ran the operation as the
chief operations officer.  AP-ECF No. 164, p. 3; AP-ECF No. 281, p. 90.  Alan Sr.'s wife
Helen worked as the Debtor's bookkeeper and by the early 1990's Carl's daughter, Kim,
worked in the office as the accounting manager; Alan Jr. and Vincent (Carl's son)
worked as laborers and equipment operators.  AP-ECF No. 277, p. 72; AP-ECF No.
281, pp. 91, 216; AP-ECF No. 282, p. 230.

The Debtor operated from premises located at 35 Lumberyard Road, Clinton,
Connecticut (the "35 Lumberyard Property").  C&A Development -- a company owned
fifty (50%) percent by Carl and fifty (50%) percent by Alan Sr. – leased the 35
Lumberyard Property from Shoreline Concrete Co., Inc. ("Shoreline").  The Debtor, in
turn, subleased a portion of the 35 Lumberyard Property from C&A Development.  AP-

8

ECF No. 281, p.109.  The 35 Lumberyard Property consisted of a front office building (the "Front Building") in which the Debtor's offices were located, and a rear building (the "Rear Building") in which the Debtor's equipment was stored and maintained.  AP-ECF No. 277, pp. 79-81.  The two buildings were separated by a large open area in which equipment could be stored, assembled, and moved.  AP-ECF No. 277, pp. 79-81.

### *Rival Companies Formed*

In 1990 and 1991, Alan Sr. and Carl each decided to form a separate company. Alan Sr. formed New England Road, Inc. (defendant NE Road) and Carl formed Neri Corp.[11]  Both NE Road and Neri Corp., at various times, submitted Contractor's Prequalification Statements, or "CON-16" forms, required by the State Department of Transportation in support of their respective bids on public construction projects.

Like much else here, the different family factions had different views and memories of the reasons for the establishment of NE Road and Neri Corp., and different perspectives on what those companies' formation meant for the Debtor.  According to Kim and Carl, Carl's company Neri Corp. was formed because, at the time, the Debtor's bonding program had reached its limit and Carl wanted to submit a bid on a local bridge project (Liberty Street Bridge, Clinton, Connecticut) located less than a mile from the Debtor's office.  AP-ECF No. 277, p. 220; AP-ECF No. 281, p. 105.  Carl testified that he formed Neri Corp. with Alan Sr.'s knowledge and that Alan Sr. never voiced any concerns regarding the formation of Neri Corp.  AP-ECF No. 281, p. 107.  The Debtor's former attorney, Dominic Caciopoli, testified that Alan Sr. was aware of Neri Corp.'s

---

[11]    Neri Corp. is not a party to this Adversary Proceeding.

founding and was intended to be a 50% shareholder in Neri Corp.  AP-ECF No. 279, p. 137.

According to Carl, before Neri Corp. could bid on the Liberty Street bridge project "we had to put in a CON-16 . . . ."  AP-ECF No. 281, p. 106.  When Carl told Alan Sr. they would have to put money into the company (Neri Corp.) to submit the bridge bid; Alan Sr. did not want to do that.  AP-ECF No. 281, p. 106.  Carl testified that he listed Alan Sr., Alan Jr., Vincent and himself as the key employees on a CON-16 and it was accepted because "we did Neri Brothers."  AP-ECF No. 281, pp. 106-107.  Carl also testified that Alan Jr. assisted with the preparation of the bid information.  AP-ECF No. 281, p. 106.

Consistent with Carl's testimony, Alan Jr. testified that he worked with Carl to prepare a portion of a bid for a construction job in 1990.  But when he saw the completed bid he realized it was for Neri Corp. – Carl's company -- rather than for the Debtor.  According to Alan Jr., when he told his father Alan Sr. about the bid, "[h]e was mad."  AP-ECF No. 279, pp. 64-70.  According to Alan Jr., that event was the beginning of a deterioration in the relationship between Carl and Alan Sr.  AP-ECF No. 279, pp. 69-70.

In October of 1991, a confrontation occurred between Carl and Alan Sr., Dominic Caciopoli, then the Debtor's corporate lawyer, and Attorney Zangari, a lawyer for Alan Sr.  AP-ECF No. 281, p. 98.  According to Carl, he sat down with Alan Sr. and Attorney Zangari, discussed Alan Sr.'s concerns, and "basically, Al and I agreed that we would go forward as we always had, 50/50, and that, you know, we embraced each other, and as far as I was concerned, he went to the back building to do what he was going to do, and I was going to continue on."  AP-ECF No. 281, p.100.  Attorney Caciopoli testified

that he negotiated a truce between Alan Sr. and Carl that "resulted in their hugging each other at the end." AP-ECF No. 279, p. 139. In addition, Attorney Caciopoli testified that as far as he understood the relationship he observed between Alan Sr. and Carl deteriorated over time for reasons unrelated to stock ownership. AP-ECF No. 279, p. 142. Helen, on the other hand, testified that the same meeting started with Carl kicking the door open, and that Alan Sr. was very upset after the meeting. AP-ECF No. 282, p. 234.

One month after the meeting between Carl, Alan Sr. and the lawyers, in November of 1991, Alan Sr., Alan Jr., Helen, and John formed NE Road. AP-ECF No. 279, p. 70; AP-ECF No. 282, p. 238. Helen testified that their reasons for doing so were: (1) they needed income and were not being paid by the Debtor; (2) the Debtor was unable to get bonding and therefore unable to get public work that required bonding; and (3) they could not access the Debtor's records and accounts. AP-ECF No. 366, pp. 106-108. Alan Jr. claimed that he told Vincent, Carl's son, about the formation of NE Road in March of 1992, whereas Carl maintained he was unaware NE Road existed in May of 1992. AP-ECF No. 281, p. 96; AP-ECF No. 366, pp. 142-143.

On January 15, 1992, Alan Sr. filed a CON-16 on NE Road's behalf to prequalify the new corporation with the State so that it could bid on State construction work. Exh. SSS, p. 3; AP-ECF No. 278, p. 215. The CON-16 listed Helen, Alan Jr. and John as officers of the company and Wayne Neri as a Supervisor and Owner of the company. Exh. SSS. Attached to the CON-16 were three letters from Jonathan M. Stechholz, P.E., Chief Inspector of Storch Associates detailing his work experience with Alan Sr., Alan Jr. and Wayne Neri; a letter from Noreen T. Braza, an Assistant Vice President with Conn. Traffic Signal Co, Inc. regarding its work experience with the Debtor over

11

twelve years; a letter from William D. Warren, President of Wabaquasset, Inc.,

regarding his work experience with Alan Jr., Alan Sr. and the Debtor; and financial

information regarding the newly formed NE Road.  The financial information section on

the CON-16 stated NE Road had $75,140.86 cash on hand and equipment valued at

$38,685.00, including a bucket truck, pickup truck, and fuel truck, but no other heavy

equipment.  Exh. SSS, p. 28.  The CON-16 also included a notation that additional

equipment would be rented from H.O. Penn Machinery Co. or the Debtor.  Exh. SSS, p.

28.  Like Neri Corp., NE Road utilized the work experience of various individuals who

had worked for the Debtor when submitting its own bids for public construction jobs.

*See*, AP-ECF No. 281, pp. 106-107.

NE Road used the Debtor's equipment on every job it performed from 1992

through 1995, and never rented from H.O. Penn Machinery Co.  AP-ECF No. 278, pp.

221, 224-227.  Alan Jr. testified that NE Road could have rented machinery from an

"endless" list of equipment rental companies.  AP-ECF No. 278, p. 228.  NE Road

submitted CON-16 forms for 1993, 1994 and 1995, and its Maximum Capacity Rate

increased each time.  Exhs. TTT, UUU, VVV.  The approvals by the State Department

of Transportation for 1992 and 1993 each noted, "Previous personal experience

considered."  Exhs. SSS, p. 2, TTT, p. 2.

### *1992 State Court Lawsuit:  Alan Sr. v. Carl*

A few months after NE Road submitted the CON-16 to the State, on April 1,

1992, Alan Sr. brought an action against Carl in the Connecticut Superior Court, *Alan A.*

*Neri v. Carl A. Neri*, Superior Court, Judicial District of New Haven, Docket No. CV-92-

330627, and sought, among other things, a temporary restraining order against Carl.

The complaint alleged that:  (1) Carl was removed from his position as Vice President

12

and Secretary of the Debtor and terminated as an employee of the Debtor by a vote of

the Board of Directors of the Debtor; (2) Carl had refused to turn over the books and

records of the Debtor to Alan Sr.; and (3) Alan Sr. disputed the number of directors of

the Debtor, the identity of the directors, officers, and shareholders of the Debtor, the

number of outstanding shares of the Debtor, and how many shares were held by each

shareholder of the Debtor.  Exh. 18.

During a hearing held on May 4, 1992, the parties reported an agreement as to

some matters and then Connecticut Superior Court Judge Anthony V. DeMayo issued a

temporary restraining order ("TRO") that evidenced the deep divide between Alan Sr.

and Carl.  Exh. 19.  The 1992 TRO directed some of the basic details regarding the

Debtor's daily activities, including that Alan Sr. would take over the control and

operation of the Debtor, the Debtor would operate from the Rear Building and pay rent

of $500, the money then held in the Debtor's bank account would be held by Attorneys

Mirto and Doyle as co-trustees, and the Debtor (run by Alan Sr.) would provide copies

of bid documents and contracts to Carl's attorney.  As to books, records, and office

supplies, they would be moved to the Rear Building, out of which the Debtor would be

run.  Construction equipment would be stored and parked at the 35 Lumberyard

Property when not in use and Alan Sr. or his agents would keep a daily sign in and sign

out log of equipment use.  Finally, "[i]f available, corporation construction equipment

shall be leased to Carl A. Neri or [Neri Corp.[12]] at prevailing fair market rental rates

provided said equipment is to be operated by a competent operator.  If the corporation

---

[12]    The 1992 TRO refers to "his company", but earlier defines Neri Corp. as "Carl A. Neri's
corporation."  Exh. 19.

[Debtor] claims the equipment is unavailable, it shall provide proof that the equipment is actually being used elsewhere on a job site." Exh. 19.

In reporting the agreement that became the 1992 TRO, Attorney Doyle, Carl's attorney, stated, "[t]he other agreement is that Neri Brothers Construction Corporation will agree to enter into on a [sic] as-available, as-needed basis, rental agreements with Mr. Neri, Mr. Carl Neri or any of his entities for equipment at the prevailing rates and under the usual stipulations and terms that are entered into in those types of rental agreements." Exh. 20, p. 9. The Defendants have asserted that "Mr. Neri" referred to Alan Sr., and that this statement by Attorney Doyle demonstrates that the parties contemplated rental by NE Road from Debtor at the time that they made this agreement. The Trustee argues that both "Mr. Neri" and "Mr. Carl Neri" refer to Carl, and that not only was rental to NE Road not discussed, but also that only Alan Sr. and the other members of NE Road knew of its existence at the time.

On January 11, 1993, Judge DeMayo issued a memorandum of decision determining share ownership and directors of the Debtor (the "Control Decision"), summarized in the following table.

| NAME | DIRECTOR (Yes or No?) | SHAREHOLDER PERCENTAGE |
|---|---|---|
| Alan Sr. | Yes | 71.96% |
| Carl | Yes | 18.7% |
| John | Yes | 4.67% |
| Estate of Anna Neri | No | 4.67% |

Exh. 21.

After the Control Decision entered, Alan Sr. transferred his 20% share in NE Road to Helen, making her the 40% shareholder in NE Road. Helen then began

serving as president of NE Road, Alan Jr. served as vice president of NE Road, while

Alan Sr. continued as president of the Debtor.  AP-ECF No. 279, pp. 185-186.  During

the period from early 1992 through the appointment of the Chapter 11 Trustee, Alan Jr.

served as vice present of the Debtor and was an officer and director of NE Road.  AP-

ECF No. 296, p. 4.

### *Condition of the Debtor from 1991 to Petition Date*<br>*Inability to Obtain Bonding*

The parties acknowledge that following entry of the 1992 TRO in May of 1992,

the Debtor did not obtain any new State construction contracts.[13]  Instead, it completed

prior contracts, completed a few private construction contracts, and rented out its

equipment until eventually filing for bankruptcy on January 17, 1995.  The parties

proffered different explanations for the Debtor's slide into bankruptcy, both relating to its

inability to obtain bonds.  The Trustee claimed the Debtor's fall was due to the actions of

the Defendants including their failure to obtain bonding, their failure to pay the Debtor's

debts, and NE Road's use or rental of the Debtor's equipment for below market rental

rates.  The Defendants claimed that the Debtor had already lost its ability to obtain new

bonding prior to the entry of the 1992 TRO, and that renting out the Debtor's equipment

was the only way to bring any funds into the Debtor corporation.

Taking into account the evidentiary record as a whole, it is clear the Debtors'

failure to obtain new State construction contracts or other construction work was the

result of multiple factors, including a combination of the following:  the underlying

tension and turmoil among the Carl family and Alan Sr. family factions; the Debtor's lack

---

[13]     The Defendants claimed that the cause of the Debtor's failure to obtain new contracts occurred
earlier.

of financial records and disrupted banking relationships; the dysfunction of the owners;

both Alan Sr.'s and Carl's new economic focus on their respective, new corporations;

and, at least some litigation regarding unpaid corporate debts such as the obligation to

Dominic Caciopoli (*see* for example, Proof of Claim 49 in the Main Case).

The status of the Debtor's bonding program during 1991 and 1992 was a

contested issue.  Bonding is necessary for contractors to qualify to bid for State

construction jobs.  AP-ECF No. 275, pp. 95-96; AP-ECF No. 277, pp. 210-211.  As a

company progresses as a State contractor, its bonding limit increases.  When a

company has jobs to the extent of its bond capacity, it cannot bid on further State jobs.

The parties drew distinctions between a bid bond, necessary to bid on a project, and a

performance bond, necessary to enter into and perform a contract.  Obtaining any

bonding requires that the business build and maintain the confidence of a bonding

agent.  Regular provision of updated financial information is necessary in order to

maintain a bonding agent's confidence.  Exh. 150, p. 7.  The Debtor's primary bonding

agent, Anthony DeMaria,[14] described the process as "produc[ing] a credit file of financial

and character information and information regarding the ability to do the work intended."

Exh. 150, p. 7.

The Defendants asserted that the Debtor's inability to obtain new bonds was due

to the actions of Carl and others prior to the entry of the 1992 TRO, and to Carl retaining

the Debtor's financial statements after the 1992 TRO entered.  The Defendants pointed

to statements by Kim and Carl that Neri Corp. was founded because the Debtor could

not get bonding.  The Trustee, however, explained these statements as meaning that

---

[14]    As stated earlier, DeMaria testified via trial deposition.  AP-ECF No. 282, p. 5.

the Debtor was at its bonding limit, therefore it could not submit bids for new State jobs,

but it nonetheless still had a robust bonding program.  In his 1998 testimony during an

arbitration, Carl testified that the Debtor laid off some employees in 1990 due to the lack

of bonding, but at trial he clarified that this was again because the Debtor was at its

bonding program limit and the layoff was part of a winter shutdown.  AP-ECF No. 281,

pp. 138-39; 140–41.  Carl claimed that the Debtor still had a bonding program in 1990.

AP-ECF No. 281, pp. 138–39.  Kim testified that the Debtor was able to get bid bonds

from DeMaria in 1991, but she did not state specifics or have copies of any bonds from

1991.  AP-ECF No. 277, pp. 199–200; AP-ECF No. 283, p. 242.  Kim also testified that

the problem was not that the Debtor failed to get bonding but rather that Alan Sr. was

not interested in bidding on construction projects for the Debtor to perform.

Alan Jr. testified that after the 1992 TRO, the Defendants could not get bonding

for the Debtor because they did not have any accountant prepared financial statements.

AP-ECF No. 278, pp. 268-269.  He testified that they (*i.e.*, the Alan Sr. family running

the Debtor) did try to get bonding for the Debtor, but did not have anything in writing

demonstrating their efforts after the 1992 TRO entered.  AP-ECF No. 278, pp. 268-269.

The Defendants reconstituted balance sheets and income statements for the Debtor

from 1992 to 1994 in preparation for trial.  During trial, Alan Jr. had no explanation for

why the Debtor could not have hired an accountant to prepare the same documents in

order to get bonding for the Debtor after the 1992 TRO.  AP-ECF No. 278, pp. 270-271.

David Johnson, an accountant for NE Road, prepared the Debtor's tax returns in

1994.[15]  AP-ECF No. 275, p. 96.  He testified that he prepared the Debtor's 1992 and

---

[15]      Johnson also testified that he had prepared annual financial statements for NE Road's bonding applications.

1993 tax returns in 1994 because, "[w]e didn't receive certain information from the prior accountant until August of 1994." AP-ECF No. 275, p. 97. Alan Jr. also testified that he explained the ongoing conflict between Carl and Alan Sr. to a bonding agent, Tom Otto, in early 1992 and was told that a company in that situation would not be able to get a bond. AP-ECF No. 279, p. 79; AP-ECF No. 366, pp. 150-51.

Alan Jr. and Helen testified that Carl and Kim had the primary responsibility to obtain bonding. AP-ECF No. 279, p. 81 (in March of 1992, Carl had the records, so Alan Jr. couldn't apply for bonding); AP-ECF No. 282, p. 231 (Helen didn't know about bonding, Carl ran everything). Helen testified that Alan Sr. and Alan Jr. went to see a bonding agent in 1992, but were unable to secure bonding for the Debtor. AP-ECF No. 366, pp. 18–19. Helen confirmed that while she said there were meetings with bonding agents regarding the Debtor, the Defendants never submitted a bonding package on the Debtor's behalf. AP-ECF No. 366, pp. 126–127.

In contrast, the Trustee asserted that Helen rather than Carl was responsible for updating DeMaria regarding financial information to support bonding applications, and that after the 1992 TRO entered, Alan Sr., Alan Jr., and Helen made no attempt to update DeMaria or try to obtain bonding through other agents. Carl and Kim testified that Helen was in charge of sending financial information to the accountant for the Debtor, who then prepared it for the bonding agent. AP-ECF No. 281, pp. 104, 184-85. Carl stated that no one was specifically in charge of getting bonds and he, Alan Jr., or Kim all might work on the bonding. AP-ECF No. 281, p. 182. Helen testified that she kept the books for both companies, the Debtor and NE Road, from May of 1992 to October of 1995. AP-ECF No. 366, p. 10.

18

Dominic Caciopoli, the Debtor's former attorney, testified that he frequently met with the bonding company for the Debtor and that the Debtor had bonding in place in January of 1991, November of 1991, and May of 1992. AP-ECF No. 279, p. 135. He also testified, however, that he did not know whether they received any new bonds in 1991 or 1992. AP-ECF No. 279, p. 144.

DeMaria testified that he did not recall ever being approached by Alan Jr., Alan Sr., or Helen regarding obtaining a bond for the Debtor. Exh. 150, p. 35. DeMaria also confirmed that a contractor could be denied a bond on a project-specific basis if the job exceeded the bonding limit, but still be able to maintain its overall bonding program. DeMaria further testified that he did not recall Carl asking for bonding on behalf of the Debtor after January of 1990. Exh. 150, p. 39. DeMaria stated that generally, he received financial information from Debtor via forms they sent him, and that he did not discuss financial information with anyone specific at the company. Exh. 150, p. 25.

Little, if any, documentation of bonding exists.[16] Helen testified that she did not have anything in writing regarding efforts to get bonds for the Debtor, and did not "think we ever actually made it to that step." AP-ECF No. 279, p. 192. Richard Finkel, an accountant hired by the Trustee to examine Debtor's records, stated that he had not found documents indicating that bonding had terminated. AP-ECF No. 281, p. 207. He also stated that he found a couple of documents indicating bonding was in place, such as a letter dated 1994 releasing a bond that was placed in 1992, and an invoice to renew a bond in 1995.[17] AP-ECF No. 282, p. 207.

---

[16]    The parties disputed the admissibility of two exhibits at DeMaria's trial deposition. As discussed later, the Court will admit one exhibit.

[17]    No other evidence of bonds in place in 1992 or 1995 was introduced.

Exhibit 79,[18] a record from DeMaria's company, Bogina & DeMaria Incorporated, also referred to as B&D, shows five performance bonds issued to the Debtor through DeMaria's company through January 5, 1990.  Exh. 79, 150, pp. 13, 33.  Exhibit 79, however, does not show bid bonds, which would have been recorded separately and regarding which DeMaria had no evidence.  Exh. 150, p. 33.  DeMaria did recall the Debtor being issued bid bonds, but did not recall how many.  Exh. 150, p. 34.  In addition, DeMaria was unable to recall whether there were any further requests for bonding for the Debtor after January 5, 1990, or whether he requested information from the Debtor after January 5, 1990.  Exh. 150, pp. 14–15.  He noted that requesting updated information was his standard operating procedure.  Exh. 150, p. 15.

Based on this record, the Court finds that after the entry of the 1992 TRO the Debtor did not have bonding in place that would allow it to qualify as a bidder for State construction contracts.  Further, it is clear there was no effort made by Alan Sr. or the other Neri family members handling the day-to-day operations of the Debtor to obtain such bonding for the Debtor after the entry of the 1992 TRO.

### *The Debtor's Financial Condition*

Like much else, the parties contested the financial condition of the Debtor in early 1992, and in the years after the entry of the 1992 TRO preceding its filing for bankruptcy in 1995.  The Trustee asserted the Debtor was insolvent from the time the 1992 TRO entered, or from at least May 1992, while the Defendants claimed the Debtor was solvent until it filed for bankruptcy in January 1995.

---

[18]    The Defendants questioned DeMaria regarding Exhibit 79 during DeMaria's trial deposition.  Exh. 150, pp. 12–13.  The Trustee then stated he had no objection to its admittance as an exhibit.  Exh. 150, p. 13.

Helen testified extensively regarding the Debtor's financial condition when the Defendants took over.  She and Alan Sr. had to make personal loans to the Debtor after the 1992 TRO entered because the Debtor's insurance was about to be canceled, the financing companies were owed payments for the equipment, and a roller had been repossessed.  AP-ECF No. 366, p. 2–4, 137.[19]  On cross examination, the Trustee produced a "Call for and Notice of Special Meeting of the Board of Directors of the Neri Bros. Construction Corp.," signed by Alan Sr. on February 29, 1992.  Exh. RRRR; AP-ECF No. 366, p. 114.  Among other purposes for the meeting, such as removing Carl from his position as Vice President and Secretary, was: "[t]o close all bank accounts that are now open in the name of the Corporation and to notify Fleet Bank to not honor any checks written on these accounts."  Exh. RRRR.

Helen testified that the account was not closed by the Board as contemplated by the Call for Notice, but rather was frozen by Fleet Bank when it received conflicting orders from Carl and Alan Sr.  AP-ECF No. 366, p. 115.  In prior testimony during an arbitration proceeding between Carl and Alan Sr. concerning the dissolution of a different company (CAN Development) Helen testified that Alan Sr. and John had frozen the checking account.  AP-ECF No. 366, pp. 107-108, 117.  A ledger written by Helen showed bills being paid from January 23, 1992, to March 6, 1992, but Helen stated the ledger written had been recreated later in 1992 and that she could not confirm whether those payments were for current or past due bills. AP-ECF No. 366, pp. 119–21.  Helen acknowledged that the account was frozen for at least two months, during which bills

---

[19]    Helen referred to Exhibit IIIIII for record of the payments made by Alan Sr. and herself.  However, Exhibit IIIIII was never admitted as a full exhibit.

could not be paid, but maintained that before the account was frozen in March of 1992, the Debtor's payments were already behind.  AP-ECF No. 366, p. 118.

Between 1992 and 1996, the Debtor's income took two forms:  construction projects and equipment rental.  The Debtor finished State projects it had already begun or acquired private or subcontractor projects.  According to the Cash Receipt Summary Report prepared by Kim, Exhibit EEE, the Debtor's receipts for construction projects and equipment rental included the amounts summarized in the following two tables.

| Construction Project Name | Amount |
|---|---|
| ALLED/DELLA | $45,530.40 |
| Falvey Construction | $158,390.00 |
| Phil Hayes Builder | $55,002.55 |
| SOC Construction | $250,497.47 |
| Redfield Repair | $2,125.00 |
| Driveways | $4,746.77 |
| Westbrook Elks | $48,147.00 |
| Misc. Repairs | $8,173.45 |
| TOTAL: | $572,612.64 |

| Equipment Rental Customer | Amount |
|---|---|
| Watertown | $18,620.00 |
| Bombaci | $1,976.00 |
| Camputaro | $2,385.00 |

| New England Road, Inc. | $132,000.00[20] |
|---|---|
| TOTAL: | $154,981.00 |

Adding retainage from prior projects of $65,182.90, the Debtor's total cash receipts for 1992 to 1996 were $792,062.49.  Its cash disbursements, based on the Cash Disbursement Summary Report prepared by Kim, were $806,269.24.  Exh. EEE.

Helen kept an accounting ledger with the amounts owed between the Debtor and NE Road, and two copies of the ledger were introduced into evidence at the trial.  AP-ECF No. 279, p. 198.  The Trustee's Exhibit R showed NE Road owed the Debtor $13,466.00 as of April 21, 1995.  The Defendants' Exhibit 60 showed the same amount due the Debtor as of April 21, 1995, but included additional entries through February 28, 1996, with an ending balance of $9,019.00 owed by the Debtor to NE Road.[21]  The ledger tracks rental by NE Road from the Debtor as "credits" that increase the balance due to the Debtor, payments by NE Road to the Debtor as "debits" that decrease the balance due to the Debtor, and credits by NE Road to the Debtor as "discounts."  Discount items include rental by the Debtor of NE Road equipment, rental payments for the 35 Lumberyard Property, fuel, and building materials.[22]  Exh. No. 60.  The total debits and discounts on Exhibits R and 60 are as follows:

Exhibit R:   Debits:       $124,112.29
             Discounts:    $37,245.26
             Total:        $161,357.55

---

[20]        This NE Road figure is a cash figure stipulated by the parties during trial.  AP-ECF No. 275, p. 70.
[21]        In her October 18, 2002  interrogatory answers, Exhibit LLLLL,  Helen attested she did not have any documents demonstrating billing between the Debtor and NE Road.  AP-ECF No. 279, p. 212.
[22]        Helen's testimony is somewhat ambiguous as to whether the "debits" are actual payments or offsets.  AP-ECF No. 279, p. 200.

Exhibit 60:  Debits:      $131,285.95[23]
             Discounts:   $111,492.40
             Total:       $242,778.35

David Johnson, an accountant and expert witness for the Defendants, created

the Debtor's financial statements for December 31, 1992, December 31, 1993, June 30,

1994, and December 31, 1994.  Mr. Johnson opined in his written report that the Debtor

was solvent on those dates, by which he meant that it owned assets having an

estimated value in excess of its liabilities.  Exh. K.  Johnson's findings are summarized

in the following table, and compared to Proof of Claim 49, filed by one creditor (Dominic

Caciopoli), that reflected escalating debt during the same period.

*Johnson's Summary of the Debtor's*
*Financial Condition Versus Increasing Caciopoli Debt*

| Time Period | Assets | Liabilities | Difference (Assets – Liabilities) | Caciopoli Liability (POC 49) |
|---|---|---|---|---|
| December 31, 1992 | $1,004,733 | $444,364 | $560,369 | $245,494 |
| December 31, 1993 | $854,516 | $449,877 | $404,639 | $265,088 |
| June 30, 1994 | $848,216 | $439,740 | $408,476 | $275,580 |
| December 31, 1994 | $733,350 | $499,489 | $233,861 | $286,126 |

Exh. K; Proof of Claim 49.

Alan Sr. acknowledged in his testimony at a deposition (read into the record

during trial) that the combined salaries of himself and his family members who were

employees of the Debtor were close to the gross receipts of the Debtor, but claimed that

the company was progressing even in 1994 and had increased its assets from 1991

when he took over to 1995 when the chapter 11 case was filed.  AP-ECF No. 278, pp.

---

[23]     During trial, the parties stipulated that the amount of cash paid by NE Road to the Debtor was
$132,000.00, in the aggregate, for the years 1992, 1993, 1994, 1995 and 1996.  AP-ECF No. 275, p. 70.

116-117.  Alan Sr.'s testimony regarding increased assets is essentially unsupported by Mr. Johnson's report and the balance of the record.

### *Rental Agreements Between NE Road and the Debtor*

After the 1992 TRO entered, Alan Sr. was in charge of the Debtor while NE Road began renting equipment from the Debtor.  These rentals form the crux of the Trustee's claims against the Defendants.  The parties hold diametrically opposed views regarding a number of issues:

(1) whether the 1992 TRO authorized rental from the Debtor to NE Road;

(2) whether Carl or anyone else other than Alan Sr., Alan Jr., John, and Helen knew about the existence of NE Road or knew that NE Road would be renting from the Debtor when the parties to the 1992 State Court Lawsuit agreed to the 1992 TRO;

(3) whether the rental agreements were reached as a result of arm's length bargaining;

(4) whether the rental agreements were recorded in writing;

(5) whether the billing from NE Road to the Debtor accurately reflected NE Road's use of the Debtor's equipment; and

(6) whether the billing from NE Road to the Debtor was for reasonably equivalent value.

### *Authorization for Agreements*

Alan Jr. claimed the equipment rental by NE Road was authorized by the following paragraph of the 1992 TRO:  "For any contract into which [the Debtor] enters with any entity owned in whole or in part by [Alan Sr.], the contract will include the fair market rental value for any equipment leased from or used by the [the Debtor] if [it] is a subcontractor."  Exh. A, AP-ECF No. 278, pp. 265–66.  Alan Jr. maintained that this sentence authorized the Debtor to rent equipment to NE Road, even though Alan Sr. later transferred his ownership interest in NE Road to Helen (in January of 1993) and

25

even though the Debtor was not a subcontractor on any of the NE Road jobs.  AP-ECF
No. 278, pp. 265–68.

Robert Mirto, the attorney for the Debtor at the 1992 TRO hearing, testified
regarding the 1992 TRO hearing.  Specifically, he testified regarding his understanding
of Attorney Doyle's (Carl's attorney) statement that the parties had agreed, "that Neri
Brothers Construction Corporation will agree to enter into on a [sic] as-available, as-
needed basis, rental agreements with Mr. Neri, Mr. Carl Neri or any of his entities for
equipment at the prevailing rates . . . ."  Exh. 20, p. 9.  Attorney Mirto testified that he
understood "Mr. Neri" referred to Alan Sr., and "Mr. Carl Neri" referred to Carl.  AP-ECF
No. 275, pp. 12-13.  Kim testified that it was her understanding that "Mr. Neri" referred
to Carl and "[n]o one talked about New England Road."  AP-ECF No. 277, p. 228.  She
acknowledged that the 1992 TRO itself provided for rental to Alan Sr. or any of his
companies, but claimed that Attorney Mirto had submitted an order that did not match
the agreement, and her attorney had missed it.  AP-ECF No. 277, p. 228.  Kim testified
that her understanding of the agreement reached at the 1992 TRO hearing was that
Alan Sr. would take over the Debtor and rent the Debtor's equipment to her father Carl,
her brother Vincent, or their entities.

### *Who Knew NE Road Existed and Would be Renting from the Debtor?*

In addition to whether the 1992 TRO authorized rental, another issue was
whether anyone other than the Defendants knew that NE Road existed at the time of
the 1992 TRO hearing.  Kim testified that "we" – presumably the Carl Neri family
members including herself, Carl, and Vincent – did not know that NE Road "was doing
anything or was interested in any of the use of this equipment . . . ."  AP-ECF No. 277,
p. 226.  Carl testified that the 1992 TRO did not accurately reflect the agreement

26

reached at the 1992 TRO hearing, although he had testified at earlier depositions that it did.  AP-ECF No. 281, pp. 157-160.

Alan Jr. claimed that he told Vincent, Carl's son, about the formation of NE Road in March of 1992, whereas Carl maintained he was unaware NE Road existed in May of 1992.  AP-ECF No. 281, p. 96; AP-ECF No. 366, pp. 142-143.  Attorney Mirto testified regarding his understanding of the 1992 TRO hearing that "Alan [Sr.] also had another corporation, [NE] Road, and they knew about that.  And we were just assuring that because we were running [the Debtor] we could rent to [NE] Road without any agreement . . . ."  AP-ECF No. 275, pp. 12-13.

### _Negotiating Rental Rates between the Debtor and NE Road_

Alan Jr. testified that he represented NE Road and Alan Sr. represented the Debtor in reaching the agreement that NE Road would rent from the Debtor.  AP-ECF No. 279, p. 87.  Alan Jr. believed NE Road should buy equipment rather than rent from the Debtor because he believed buying would be cheaper.  Eventually, Alan Jr. agreed NE Road would rent from the Debtor as a way to save the Debtor's business because that was Alan Sr.'s wish.  AP-ECF No. 279, pp. 86–90.  Alan Sr. had previously testified in a deposition prior to his death that Alan Jr. was primarily responsible for setting the rental rates, along with himself, Carl, and John.  AP-ECF No. 278, pp. 159–60 (prior testimony read into record).  Alan Sr. also testified that the three brothers and Alan Jr. had set the rates on behalf of both companies, and that the rates were determined using the blue book – the Rental Rate Blue Book for Construction Equipment (the "Blue Book")[24] – but that the rate ultimately had to fit the job.  AP-ECF No. 278, pp. 161–63.

---

[24]     Several different editions of the Blue Book were admitted into evidence.  See Exh. 33, 103, 104, 6-D, 6-P.

Alan Jr. testified that another agreement, regarding use of the Debtor's mobile field office by NE Road without compensation, was made with Alan Jr. wearing a NE Road hat and Alan Sr. wearing a Debtor hat.  AP-ECF No. 283, p. 152.  While the 1992 TRO referred to "fair market rental value," Judge DeMayo did not specify what standard to use for fair market rental value.  AP-ECF No. 281, p. 93.

### *Existence of Any Writing Memorializing Agreement*

The parties also disagreed regarding whether the equipment rental agreements were ever reduced to writing.  Alan Jr. testified that the sign out sheets used from May of 1992 to January of 1993 to record equipment use (the "Equipment Sign-Out Sheets") constituted the written agreement regarding rental between the Debtor and NE Road.  AP-ECF No. 278, pp. 244, 263; Exh. 42.  Alan Jr. conceded that the Equipment Sign-Out Sheets were not signed by either party, but he believed because the agreement was ordered by the state court, they were sufficient.  AP-ECF No. 278, p. 244.  The Equipment Sign-Out Sheets were headed with the Debtor's name and address.  They also contained space for the name of the entity signing out the equipment, a description of the project, and three conditions under which the equipment could be signed out: Borrowed, Rental, or Leased.  Exh. 42.  They also had space for descriptions of each piece of equipment, when removed, and when returned.  Below this were three notes Alan Jr. claimed comprised the agreement between the Debtor and NE Road:  "1. Borrowed Equipment will not be billed  2.  Rental Equipment will be billed at the Blue Book Rate as Priced in the State of CT D.O.T. Form 814, and only for the time the equipment is actually in use.  3.  Leased Equipment will be billed at a monthly rate as agreed to by Alan A. Neri."  Exh. 42.  Alan Jr. also subsequently asserted that the terms were more detailed than expressed by the Equipment Sign-Out Sheets during his

28

testimony.[25]  AP-ECF No. 278, pp. 252–53.  Alan Jr. acknowledged that these more

detailed terms were not contained in the Equipment Sign-Out Sheets.  AP-ECF No. 278,

p. 255.  He also stated that the agreement was revised, with Alan Jr. representing NE

Road and Alan Sr. representing the Debtor, so that the four-hour minimum did not apply

to trucks, although he did not have an exact date for when this change went into effect.

AP-ECF No. 278, pp. 256–57.

### *Equipment Use*

Alan Sr. testified, via his prior deposition, that the time sheets were used until

Judge DeMayo issued the Control Decision, on January 11, 1993.  AP-ECF No. 278, p.

119.  NE Road's record of its use of the Debtor's property was provided in the form of

spreadsheets listing the Debtor's equipment for each job and the amount of time it was

used.  Exhibit HHHHH.  Alan Jr. testified that at each job the NE Road foreman would

manually record the use of equipment and hand in sheets at the end of the day.  AP-

ECF No. 278, pp. 241–42; Exh. MMMMM, HHHHH.  These sheets were then used to

create a handwritten spreadsheet that was then used to create the electronic

spreadsheet that NE Road produced in response to the Trustee's request for all records

regarding equipment use (the "Equipment Use Spreadsheets").  AP-ECF No. 278, pp.

241–42; Exh. MMMMM, HHHHH.  He also testified that certain small equipment and

materials, such as a curing box, crane mats, delineators, and forms, were not recorded.

AP-ECF No. 278, p. 239.  Upon questioning by the Bankruptcy Court, Alan Jr. stated

---

[25]      "The terms were to rent the equipment on a four-hour minimum when it was actually used. To get
a fair market price we divided – we took a Blue Book monthly rate, divided it by 176, which is as it's
spelled out in the state of Connecticut (inaudible).  We multiplied by an area cost and an age cost and
added in an operating cost for when it was operating, and that was to be paid when it was actually used."
AP-ECF No. 278, pp. 252–53.  These terms will be discussed in greater detail in the section on rate
setting, below.

that the foreman's logs had been lost in a flood, leaving only the Equipment Use

Spreadsheets he had provided to the Trustee.[26]  AP-ECF No. 279, pp. 172–73.

To contest the accuracy of the Equipment Sign-out Sheets (Exh. JJJJJ) and the

Equipment Use Spreadsheets (Exh. HHHHH, OOOOO), the Trustee hired L & J

Associates to track the use of the Debtor's equipment by NE Road.  L & J Associates,

consisting of Judith Wood and her late husband, Leonard Wood.[27]  Wood used daily

inspection reports by the Connecticut Department of Transportation inspectors (the

"Inspector Reports"), the list of the Debtor's equipment from the Auction (the "Auction

List"), and some actual billings from NE Road to the Debtor[28] to prepare spreadsheets

for projects on which NE Road used the Debtor's equipment, determining what

equipment was on the site each day and whether it was active or idle (the "Equipment

Use Analysis").[29]  Exh. PPPPP–WWWWW; Exhibit 83 (Summary).  Wood prepared

both a spreadsheet summarizing each project and separate spreadsheets for each

project month.

Wood prepared the Equipment Use Analysis including the following projects:

- Project #78-86, Marlborough and Colchester Culvert Ext. & Bridge
  Removal, Exhibit PPPPP (the "Marlborough Project")

- Project #49-105, Improvement on Connecticut Route 153, Essex,
  Exhibit QQQQQ (the "Essex Project")

- Project #14-141, Branford Replacement Bridge, Exhibit RRRRR (the
  "Branford Project")

---

[26]    It is unclear what happened to the handwritten equipment use spreadsheets.

[27]    Wood testified that she and her husband began tracking the use of the Debtor's equipment prior
to his death.  He was the construction expert and she did administrative work and data entry.  Following
his death, she completed the report and testified at trial regarding it.  AP-ECF No. 279, pp. 214-15.

[28]    Wood stated that she had examined billings from NE Road to the Debtor, but the Court infers that
she misspoke and that she complied her report using the billings from the Debtor to NE Road.

[29]    The project summary spreadsheets are entitled "Equipment Use Analysis," and the monthly
sheets are entitled "Equipment Rate Analysis."  The daily spreadsheets do not include rate information –
a dollar amount charged per hour, day, week, or month of use – therefore the Court refers to both the
summary sheets and monthly spreadsheets as the Equipment Use Analysis.

- Waterside Lane Bridge, Clinton, Exhibit SSSSS (the "Clinton Project")
- Project #58-224, Platforms Groton/New London Airport, Exhibit TTTTT (the "Groton Project")
- Project #69-69, Killingworth and Replacement Green Hill Rd. Bridge, Exhibit UUUUU (the "Killingworth Project")
- Project #173-239, Trumbull Rehab Bridge, Exhibit VVVVV (the "Trumbull Project")
- Project 15-217, Bridgeport Stratford Avenue Retaining Wall, Exhibit WWWWW (the "Bridgeport Project").

The Trustee also included as his Exhibit XXXXX the NE Road Equipment Use Spreadsheets for a project in Fishers Island, New York (the "Fishers Island Project"), for which Wood did not prepare an equipment use analysis.

The equipment use stated in the Equipment Use Analysis and in NE Road's Equipment Use Spreadsheets vary. First, they each use different counting methodologies. The Equipment Use Analysis tracks the number of days on which a given piece of equipment was active and the number on which it was idle, while NE Road's Equipment Use Spreadsheets track hours active and idle on each day. For example, on the Marlborough Project, the Equipment Use Analysis shows the 1988 JD 710B Backhoe Loader as active for 13 days and idle for 3 days in April of 1993, whereas NE Road's Equipment Use Spreadsheet for April of 1993 shows the JD 710B active for 42.50 hours and idle for 11.50 hours over 13 days, with no days on which the equipment was idle that it was not also active.[30] Exh. PPPPP, MMMMM. On the other hand, the NE Road Equipment Use Spreadsheet for March 1993 shows a JD 510 C as active for 4.5 hours on March 23, whereas the Equipment Use Analysis shows a 1988

---

[30] The use of different, and sometimes fairly generic names for equipment is an additional challenge when analyzing the evidence.

JD 510C 4WD w/ Cab Backhoe Loader as first active on the Marlborough Project in

September of 1993.  Exh. PPPPP, MMMMM.

The Court questions the reliability of the Equipment Use Analysis given that the

Inspector Reports relied upon often used generic - and not easily identifiable -

descriptions of the equipment, that the Inspector Reports themselves contained

discrepancies, and that that the Equipment Use Analysis for the Branford job, marked

equipment as in use during July of 1996 following the Auction.  NE Road may have

purchased the Debtor's equipment and continued to use it, but would not then be

renting it.  Neither the Auction report, Exhibit 27, nor any other evidence before the

Court, provided the names of buyers, but only a number used to identify them.

The Inspector Reports were prepared by inspectors employed by the Connecticut

Department of Transportation on a daily basis for State projects.  AP-ECF No. 366, pp.

86-87.  The inspector would mark, for each piece of equipment, whether it was idle

(turned off) or active (turned on).  For an Inspector Report on a contract project, where

the State paid for the project as a whole, inspectors would generally just mark whether a

given piece of equipment was active or idle for that day.  AP-ECF No. 366, p. 94.  In a

cost-plus project, where the State paid for the hours that a contractor used its personnel

and equipment, the Inspector Reports were more detailed, tracking the hours that a

given piece of equipment was in use or idle.  AP-ECF No. 366, pp. 92–94.

As an example of the discrepancies between the Equipment Use Analysis and

the Inspector Reports and Daily Reports of Cost Plus, the Defendants prepared exhibits

showcasing inconsistencies.  For example, Exhibit 71A consists of a page from the

Equipment Use Analysis for the Branford job in July 1996, Inspector Reports for the

Branford job, and a Daily Report of Cost Plus for July 1, 1996.  The Equipment Use

Analysis has a 1973 International 6 cy Dump Truck marked as active for 4 days and inactive for 4 days.  The Inspector Reports for those days list a dump truck, and the Daily Report of Cost Plus lists a 1987 Peterbuilt Dump.  The Defendants' cross examination of Wood implied that the dump truck referred to in the Inspector Reports is the 1987 Peterbuilt Dump owned by NE Road rather than the 1973 International 6 cy Dump Truck owned by the Debtor.  AP-ECF No. 279, pp. 240–245.  The fact that the 1973 International 6 cy Dump Truck is marked as active following the Auction suggests that this might be true, but on the other hand there is nothing in the Daily Report of Cost Plus indicating that the Daily Report was prepared for the Branford job.  Also, the date of the Auction is stated on the Equipment Use Analysis, demonstrating that Wood was aware of it when tracking the equipment.  As another example, Wood marked a 1983 GMC 6000 as idle on days where the inspectors marked "3 pick up GMC," "2 pick up GMC," without in any way eliminating the possibility that NE Road itself may have owned a GMC pickup.

### *Calculating Reasonably Equivalent Value*

In addition to when NE Road used the Debtor's equipment, the other key component of determining whether NE Road paid the Debtor fairly is how much the Debtor charged NE Road.  The charge has several components, whether an active or idle rate was being charged, what the rate was, and the amount of time charged.  The NE Road Equipment Use Spreadsheets demonstrate the Defendants' methodology for charging and the actual charges. Exh. HHHHH, MMMMM.  The Trustee's claim as to what should have been charged was contained in Kevin Smith's rental rate report (the "Smith Report").  Exh. ZZZZZ.

33

As previously stated, the Equipment Sign-Out Sheets that Alan Jr. testified

memorialized the agreement between NE Road and the Debtor stated, "Rental

Equipment will be billed at the Blue Book Rate as priced in the State of CT D.O.T. Form

814, and only for the time the equipment is actually in use."  Exh. 42, AP-ECF No. 278,

p. 244.  Alan Jr. expanded the rental terms during his testimony:  "The terms were to

rent the equipment on a four-hour minimum when it was actually used.  To get a fair

market price we divided -- we took a Blue Book monthly rate, divided it by 176, which is

as it's spelled out in the state of Connecticut (inaudible).  We multiplied by an area cost

and an age cost and added in an operating cost for when it was operating, and that was

to be paid when it was actually used."  AP-ECF No. 278, pp. 252-53.  Alan Jr. further

specified that the agreement was subsequently revised so there was no four-hour

minimum for trucks, but could not specify when the change occurred; he acknowledged

that this was not in writing anywhere.  AP-ECF No. 278, pp. 256, 278.  NE Road's

answer to an interrogatory stated that the agreement was later modified to include the

four-hour minimum; Alan Jr. stated that this answer was incorrect.  Ex. H-5, AP-ECF

No. 278, p. 265.

The Blue Book is a national publication providing a variety of information for use

in the construction industry, including equipment rental rates.  AP-ECF No. 282, p. 73.

Smith testified that the Blue Book was a good guideline for equipment rental rates, but

did not include profit and overheard.  AP-ECF No. 282, p. 74.  Smith further testified that

while the Blue Book was not used for the rates themselves, there would be no other

way to determine what equipment rental rates were in the past.  AP-ECF No. 282, pp.

75-76.  The Blue Book itself stated: "Rental rates in this guide are based on ownership

and operating costs for contractor-owned equipment.  The term 'rental' does not refer to

34

third-party contracts for the use of equipment.  Profit, project overhead, and general company overhead costs such as office facilities and supplies are not included in the rates shown in this guide."  Exh. 33 (1990 Introduction); *see also* Exh. DDDDD (1995 Introduction).

The Blue Book contained tables of equipment.  For example, the Caterpillar 235, a Crawler Mounted Hydraulic Excavator, is listed in 235B (1988) and 235C models for 1992.  *See* Exh. 103.  For each model there were entries for bucket capacity, operating weight, HP (Horsepower), Monthly, Weekly, Daily, and Hourly rates, and an Estimated Operating Cost/Hr.  The monthly rate was lower than four weeks charged at the weekly rate, and the weekly rate was lower than five days at the daily rate.  AP-ECF No. 282, p. 72.  The Blue Book also contained separate adjustments for age, region, and other factors.  AP-ECF No. 282, p. 83; Exh. 33.  It discussed "standby rates", stating that "[s]tandby refers to the situation where equipment is on the job and available for work, but is not put into operation until needed. . . .  No industry standard exists regarding the computation of standby rates."  Exh. 33, § 1-9.  The Blue Book suggested that a standby rate could be calculated by adding the adjustment rates for depreciation, annual cost of facilities capital, and indirect costs, yielding an adjustment factor of 64% of the Blue Book rate, but further stated that this was an example and "is not meant to establish a correct way of determining standby rates."  Exh. 33 § 1-9.

Form 814, Standard Specifications for Roads, Bridges and Incidental Construction ("Form 814"), was a publication of the State of Connecticut Department of Transportation.  Exh. 32.  Alan Jr. testified that the section of Form 814 used by NE Road and the Debtor to set rates was § 1.09.04.  AP-ECF No. 279, p. 99.  This section provided the basis for the State to provide compensation on a cost-plus basis when no

35

agreement as to price on a unit price or lump sum basis was made.  Exh. 32, p. 62.

The section included rates for equipment not owned by the contractor or a subsidiary of

the contractor, and for contractor owned equipment or equipment rented or obtained

from a subsidiary of the contractor.  "For rented equipment not owned by the Contractor

or a subsidiary of the Contractor, the following rates shall apply:  The daily rate per hour

shall apply when the equipment is specifically assigned to the work by the Engineer for

a period of 7 consecutive calendar days or less.  The weekly rate per hour shall apply

when the assigned time exceeds 21 consecutive calendar days."  Exh. 32, p. 65.  "For

Contractor owned equipment or equipment rented or obtained from a subsidiary of the

Contractor, the maximum hourly rate to be used shall be the monthly rate as set forth in

the current edition of the 'Rental Rate Blue Book,' including all Rate Adjustment Tables

and amendments as published by Dataquest, Inc., divided by 176 (176 working hours

per month)."  Exh. 32, p. 65.

In calculating the rental rates, Alan Jr. would calculate the applicable rate from

the Blue Book using the monthly column, then pursuant to Form 814's methodology for

contractor or subsidiary owned equipment, divide this number by 176.  AP-ECF No.

279, p. 103.  He testified that because these were the rates that the State paid, he

believed they were fair.  AP-ECF No. 279, p. 103.  Charging a four-hour minimum for

non-trucks meant if a piece of equipment was used for an hour, it would be billed as four

hours of use, consisting of one hour of active time, three hours of idle time.  AP-ECF

No. 279, p. 105.  Alan Jr. testified that he used the standby rates described in the Blue

Book as the idle rate, presumably the 64% example recited above.  AP-ECF No. 279, p.

146.  If a piece of equipment was not used on a given day, there would be no charge.

Alan Jr. stated that NE Road could not compete if they were charged for equipment

sitting idle, and that it did not matter if the equipment was sitting idle in the Debtor's yard or on a NE Road job site.  AP-ECF No. 279, pp. 86-87.

The methodology propounded by Smith differs in three significant respects. Rather than converting the monthly rate to an hourly rate as Alan Jr. did, Smith would use the daily rate unless the weekly rate was applicable because the equipment was used for four days in a seven day period, and the monthly rate if the equipment was used for three weeks in a one month.  AP-ECF No. 282, p. 71.  He also did not use an idle time rate, stating that in the equipment rental industry, there was no standard for an idle rate.  AP-ECF No. 282, p. 104.  In addition, he contended that the industry standard was to bill on a "time out" rather than a "time used" principle.  AP-ECF No. 282, p. 76.  If the equipment was out for a week but only used for two hours, billing two hours would not be practical.  AP-ECF No. 282, p. 76.  Smith also stated that he did not include operating costs of fifteen (15%) percent to twenty-five (25%) percent and profit of fifteen (15%) percent.  Finally, he did not charge for small equipment and supplies.  AP-ECF No. 282, p. 90.  In contrast to Smith's assertion that time out was the standard in the rental industry, Lawrence Casler, owner of Mass-Conn Equipment, a heavy construction equipment, sales, rental and service company, testified regarding his firm's "rental suspension program."  AP-ECF No. 283, pp. 131, 133.  Casler testified that "we had a rental suspension program that allowed the contractors to take a unit off of rent for inclement weather or job shutdowns.  Or if they were finished with one phase of the project and would utilize the same piece of equipment again in a future phase of the project, we would allow them to retain possession without being invoiced."  AP-ECF No. 283, p. 133.  He also testified that this program required "forms to fill out and process." AP-ECF No. 283, p. 133.

37

The Defendants attempted to cast doubt on the accuracy of Smith's calculations.
For example, the Defendants challenged whether the Debtor's ten or twenty year old
equipment used rented by NE Road could actually command the rates Smith
suggested.  Smith's view was that the age of the equipment was not important as long
as it was properly maintained and running properly.  AP-ECF No. 282, p. 109.  Alan Jr.
testified to what he believed was an example of the unfairness of Smith's report.  On the
Bridgeport job for March 1994, NE Road's billing indicates that a number of pieces of
equipment were active for only a few hours on two days of the month.  NE Road billed
the Debtor $379.19 for this use.  Exh. 148.  In contrast, Smith concluded that much of
the equipment was on the job for the entire month, and therefore billed for that time.
Smith's billing for the month was $24,941.17.  Exh. 148.  Smith's billing was based on
the Equipment Use Analysis, which showed multiple pieces of equipment as idle for the
entire month even though they were only active for one day.  Exh. WWWWW.  Alan Jr.
testified that if he had known that the equipment would be billed in this manner, NE
Road would have returned the equipment, but that the agreement between NE Road
and the Debtor was that NE Road would not be billed for idle time.[31]

The Trustee questioned Alan Jr. regarding his use of the Form 814, noting that
most of the jobs had not been cost-plus jobs, and about his use of a section on the form
for contractor or subsidiary-owned equipment, rather than a section for equipment not
owned by a contractor or subsidiary of a contractor.  AP-ECF No. 283, p. 93-109.  Alan

---

[31]     The Trustee also highlighted points where Smith's use of the Blue Book rate for a given piece of
equipment was inconsistent, for example using the rate for the CAT 235B in 1992 but then the CAT 235D
in 1993 when the actual piece of equipment, the Debtor's CAT 235, never changed.  AP-ECF No. 282, p.
114.

Jr. eventually agreed that the rate for contractor or subsidiary-owned equipment was more favorable to NE Road.

### *Comparative Rental Agreements*

In addition to Smith's testimony regarding standards in the equipment rental industry, the Trustee introduced evidence regarding other rental agreements. The most discussed of these was a lease agreement from NE Road to the Debtor for a crane (the "Crane Lease"). There was also evidence regarding rentals by the Debtor to other companies, regarding Neri Corp.'s attempts to rent from the Debtor, and regarding Neri Corp.'s rentals from other rental companies.

The Crane Lease was entered into between the Debtor and NE Road on August 20, 1993. Exh. Q. Unlike the agreements for equipment rental from the Debtor to NE Road, the Crane Lease was a four-page contract detailing the lease terms that was signed by Alan Sr. as president of the Debtor and Helen Neri as president of NE Road. Exh. Q. It provided for rental of a Bucyrus Erie 30-B Super Crawler Crane S/N 129020 (the "Crane") from NE Road to the Debtor for a minimum of two years at a rate of $2,000.00 per month. Exh. Q. Kim testified that the Debtor used the Crane on a job for Della Construction from which it was terminated after two months. AP-ECF No. 277, p. 100. She testified that according to NE Road's ledger maintained by Helen, NE Road was credited $20,000 against its outstanding balance to the Debtor for the Crane Lease. AP-ECF No. 277, p. 101; Exh. R. Kim acknowledged that the Debtor did not have the funds to buy a crane like that, which could cost from $40,000 to $60,000, although she claimed that the Debtor would have had the money if NE Road had paid it properly. Exh. 277, pp. 239-240. She also acknowledged that she believed the Debtor received $60,000 from the Alled/Della job. AP-ECF No. 277, p. 241. Vincent testified that he did

39

not believe the Crane Lease was necessary, because the Debtor's crane was sufficient
to perform all the projects that the Debtor took on.  AP-ECF No. 283, p. 263.

Alan Jr. confirmed a number of the basic facts regarding the Crane Lease:  the
Crane Lease was nothing like the agreement between the Debtor and NE Road for
rental of the Debtor's equipment, the Debtor was charged $20,000.00 to break the lease
when the job terminated after two months, and NE Road then began using the Crane on
the Bridgeport job.  AP-ECF No. 278, p. 247.  He also clarified, referencing NE Road's
equipment list, that NE Road purchased the Crane on August 19, 1993 for $62,242.99
and then leased to the Debtor the following day, and the $20,000 credit was decided by
Alan Jr. on behalf of NE Road and Alan Sr. on behalf of the Debtor.  AP-ECF No. 278,
p. 250; AP-ECF No. 279, p. 52; Exh. 13C. Alan Jr. further testified that NE Road had
purchased the Crane specifically so that the Debtor could perform a job for which it had
insufficient equipment.  After the Debtor lost the Alled/Della job, it submitted a bond
claim for which it was awarded $65,000 and netted $35,000.00 after the expenses of
submitting the claim.  AP-ECF No. 279, pp. 107–111.  However, when discussing the
Debtor's Cash Receipt Summary, Exh. EEE, which shows total receipts from Alled/Della
for 1994 of $35,748.40, Alan Jr. asserted that the document was incorrect because the
Debtor received an additional $30,000 that was paid to Attorney Mirto – the attorney
who represented the Debtor in the bond claim – and was not accounted for in the Cash
Receipt Summary Report.  AP-ECF No. 366, p. 123.

The two perspectives on the Crane Lease, like much else in this case, take the
same basic facts and arrive at very different conclusions.  Kim and Vincent's testimony
painted the Crane Lease as another way of extracting money from the Debtor, by
shifting to the Debtor the expense incurred by NE Road of purchasing a new crane.

40

Alan Jr., on the other hand, asserted the purchase of the Crane was another way NE

Road worked to resuscitate the Debtor by enabling it to perform a job it would not

otherwise have been able to perform.

### *Neri Corp.'s Rentals From The Debtor*

The Trustee also presented evidence of Neri Corp.'s attempt to rent equipment

from the Debtor.  As previously stated, the 1992 TRO allowed for Carl's company, Neri

Corp., to rent from the Debtor at fair market rental rates.[32]  Carl testified that he called to

the Rear Building (where the Debtor relocated after the 1992 TRO) and asked to speak

to someone about renting equipment, but they never responded.  AP-ECF No. 281, p.

94.  He then asked his attorney, David Doyle, to contact "those people" and get an

answer.  He testified that a memo from "Alan" to Attorney Mirto titled Equipment Rental

Rates (the "Equipment Rental Rates Memo") was sent in response to that request.  Exh.

B.  The Equipment Rental Rates Memo includes rental rates for several pieces of

equipment, requiring the renter to also pay the cost of an operator.  Exh. B.  The

operator requirement has its genesis in the 1992 TRO, which held that equipment

rented to Carl "is to be operated by a competent operator."  Exh. A.  The Equipment

Rental Rates Memo also requires the renter to deposit $2,500 in an escrow account

from which rental installment payments would be withdrawn and paid to the Debtor

daily.  Exh. B.  If exhausted, all work with the equipment was to cease, and the

equipment would be removed with trucking costs billed to the renter.  Exh. B.  The

Equipment Rental Rates Memo also stated that certain equipment was not available,

---

[32]     Judge DeMayo did not define fair market rental rates in the 1992 TRO; according to Carl the
judge never made a ruling as to what standard to use for fair market rental value.  AP-ECF No. 281, p.
93; Exh. A.

without providing proof that the equipment was being used on a job site.[33]  Exh. B, 19.

Vincent testified that he[34] had tried to rent from the Debtor and was stonewalled.  AP-

ECF No. 281, pp. 228–29.  Although he did not refer directly to the Equipment Rental

Rates Memo, Vincent recalled a "ridiculous fax" requiring operators with any rented

equipment.  He believed this requirement was ridiculous because he wouldn't want a

competitor's employee on a job site and Neri Corp. had personnel capable of

performing the work.  AP-ECF No. 281, pp. 228–29.

Alan Jr. testified that he wrote the Equipment Rental Rates Memo after

discussing it with Alan Sr.  He could not say how he calculated the rates, but did say

that the price of an operator was between $30 and $40 an hour.  AP-ECF No. 366, AP-

ECF No. 159–160.  He also testified that he had included an operator because of Judge

DeMayo's order, but it was not his intention to prevent Neri Corp. from using their own

operator.  AP-ECF No. 366, p. 162.  The table below contains the rates from the

Equipment Rental Rates Memo with a comparison to the rate charged to NE Road

according to the NE Road tables of equipment charges, Exh. HHHH:

| Equipment | Term | Equipment Rate Memo Rate (per hour) | Equipment Rate Memo Rate Less $35 operator cost (per hour) | Rate charged by the Debtor to NE Road (Exh. HHHH)(per hour) |
|---|---|---|---|---|
| J.D. 510 | Daily 8 hours | $69.12 | $34.12 | $27.52 (JD 510B) |
| | Weekly 40 Hours | $64.25 | $29.25 | |
| | Monthly 176 Hours | $60.86 | $25.86 | |
| J.D. 710/RAM | Daily 8 hours | $95.13 | $60.13 | $31.05 (JD 710B) $14.63 (HI-RAM) |

---

[33]    The 1992 TRO provides in pertinent part:  "If the corporation [the Debtor] claims the equipment is unavailable, it shall provide proof that the equipment is actually being used elsewhere on a job site."  Exh. 19.

[34]    Vincent did not testify whether he attempted to rent from the Debtor for himself, Neri Corp., or a different company.  AP-ECF No. 281, pp. 228–29.

| | | | | |
|---|---|---|---|---|
| | Weekly 40 Hours | $85.88 | $50.88 | |
| | Monthly 176 Hours | Not Avail. | | |
| J.D. 550 G | Daily 8 hours | $68.23 | $33.23 | $21.82 (JD 550) |
| | Weekly 40 Hours | $63.60 | $28.60 | |

### *Other Evidence of Rental Rates*

Both sides also presented evidence of the rental rates charged by other companies.  The Defendants called Tom Farace, the owner of a trucking company known as L & T Enterprises, who testified that he rented trucks to both Neri Corp. and NE Road and charged $50 an hour including an operator in 1996 for a triaxle dump truck, and testified that the rates would have been less in prior years.  AP-ECF No. 275, pp. 102-103, 105-108; Exh. 67.  With regard to the operator issue, Mr. Farace testified regarding a triaxle dump truck, "[w]e wouldn't give up [sic] $140,000 truck with no operator."  AP-ECF No. 275, pp. 102-103, 105-108; Exh. 67.

Kim testified regarding the Blue Book rate for two pieces of equipment and what Neri Corp. was charged for each piece when renting from other rental companies.  AP-ECF No. 283, pp. 230–42.  For a 40S ICE diesel hammer, the 1995 Blue Book lists a monthly rate of $4,920.00, and Neri Corp. paid $5,500.00 for one.  AP-ECF No. 283, pp. 232-33, Exh. OOOOOO, PPPPPP.  She also testified that the 1995 Blue Book rate for a D8R Caterpillar was $11,345 per month while when Neri Corp. rented the same piece of equipment in 1996, it paid $13,038 for its first month of rental, followed by $12,614 for the three following months.  Exh. No. 283, pp. 241-42; Exh. RRRRRR, pp. 9-44; Exh QQQQQQ.

Alan Jr. testified regarding a job where the Debtor served as a subcontractor[35]

for Falvey Construction (the "Falvey job") in early 1995, after the bankruptcy was filed.

AP-ECF No. 283, pp. 12–14.  The Debtor did not have a crane long enough for this job,

so it rented a crane from NE Road and NE Road billed the Debtor, according to Alan Jr.

and the NE Road Ledger.  AP-ECF No. 283, pp. 14–15; Exh. 60.  The Defendants

submitted an Equipment Use Spreadsheet showing the usage of NE Road Equipment

by the Debtor on the Falvey job.  Exh. 138.  It is broken down in the same manner as

the Equipment Use Spreadsheets for NE Road rental of the Debtor's equipment: active

and idle time, with an hourly rate for each piece of equipment.  Exh. 138.  Alan Jr.

testified he used the same methodology to calculate the rental rate for the Debtor from

NE Road as for the rentals from the Debtor to NE Road.  AP-ECF No. 283, pp. 17–18.

### *Use of the Debtor's Supplies at No Charge*

The Trustee also presented testimony and evidence[36] in support of the

proposition that NE Road used various supplies, such as crane mats, sheet piling, and

barriers (collectively referred to as supplies, in contrast to the equipment discussed

previously), for which it did not pay the Debtor at all.  AP-ECF No. 277, pp. 104–106.

Kim testified that she had taken photographs of the Debtor's crane mats – pieces of

wood placed on uneven areas on top of which the crane parks – being used at various

---

[35]      Subcontractors on a State job do not need bonding unless the contractor requires it; there is no
State requirement.  AP-ECF No. 277, pp. 94, 232.

[36]      The Defendants claimed that discussion of the supplies went beyond allegations in the complaint.
AP-ECF No. 277, pp. 110-115.  The Trustee's counsel argued that it was relevant to certain counts, such
as diversion of corporate opportunities and unjust enrichment, even though the supplies were not
referenced on the specific list of equipment attached to the complaint, and that it was relevant to show the
systematic domination of the Debtor by NE Road.  The Court (Bankruptcy Judge Dabrowski) noted that
the damages request for unjust enrichment was limited to the defined equipment, but overruled NE
Road's objection on the ground that even though the Trustee was not seeking damages for the use of the
supplies, NE Road's use of the supplies was relevant to determine the degree to which NE Road was
enriched by its use of the defined equipment.  AP-ECF No. 277, pp. 117–119.

NE Road job sites, including the Bridgeport, Killingworth, and Branford jobs.  AP-ECF

No. 277, pp. 107-109, 120.  Kim testified that she photographed the mats, showed them

to Alan Sr., and he said they were the Debtor's and NE Road had not paid for them.[37]

AP-ECF No. 277, pp. 108-110.  Attorney Edwin Doernberger, an attorney who had

represented Carl and Kim in the past, also testified that Alan Sr. had testified that NE

Road used crane mats and sheeting belonging to the Debtor without paying for it.[38]  AP-

ECF No. 282, p. 37.  Kim then testified that eleven crane mats in "horrible condition"

were sold at the Auction for $600, but the Debtor had had 30 or 36 in "perfect condition,"

worth $1,000 each, when she last saw them.  AP-ECF No. 277, pp. 120–121, Exh. W,

no. 129.  Kim conceded that she did not know how much the condition of the crane

mats would have deteriorated over time if they were not used, and conceded that she

could not definitively tell one crane mat from another.  AP-ECF No. 278, pp. 14-18.  She

also clarified, however, that she saw the Debtor's crane mats loaded on trucks, then

saw them offloaded at NE Road sites.

Kim also testified regarding steel sheeting used to build a cotterdam – a

temporary dam to hold out water while work is done – at job sites.  AP-ECF No. 277, p.

126.  She testified that the Debtor had 120 pieces of sheeting, and that one hundred

were used by NE Road at the Bridgeport job, referencing Inspector Reports describing

their use.  AP-ECF No. 277, pp. 129, 138; Exh. Z, p. 7; Exh. AA.  At the Auction, about

---

[37]    The Court admitted this testimony subject to its ultimate decision of whether Alan Sr.'s deposition
testimony would be admitted.  The Court subsequently admitted Alan Sr.'s deposition testimony.  AP-ECF
No. 278, p. 95.
[38]    The Court permitted Attorney Doernberger to testify regarding Alan Sr.'s testimony as a matter of
general background, with the understanding that the court would consult the transcript of Alan Sr.'s
testimony.  AP-ECF No. 282, p. 33.  The Trustee attached the transcript to his post-trial brief.  AP-ECF
No. 296, pp. 105-106.  Alan Sr. testified that he might or might not charge NE Road for sheeting and
crane mats, noting that NE Road had done the Debtor a favor.  He also asserted that the Debtor's crane
mats had cost approximately $500 rather than the $1,000 claimed by Kim.

sixteen pieces of sheeting that had been "cut up and damaged" were sold for $550.00.

AP-ECF No. 277, pp. 130-31, 135-36; Exh. W, No. 69.  Kim testified that NE Road

charged the State thirty-two cents per pound for the sheeting, and she calculated that

one hundred sheets would be worth $52,788.00, and the remaining twenty, which were

of an inferior type, would be worth $6,598.50.  AP-ECF No. 277, pp. 143-147, Exh. CC,

DD, EE.  She further testified that NE Road charged the Debtor for rental of sheeting in

1995, after using the Debtor's sheeting at no charge.[39]  Exh. FF; AP-ECF No. 277, pp.

150–51.  The Debtor was billed $13,593.98 for the sheeting, and Kim maintained that

NE Road used the $13,593.98 as a setoff and the Debtor paid an actual check for

$13,390.55 as well.  AP-ECF No. 277, pp. 151-52; Exh. FF, GG.  Kim acknowledged

that NE Road had also bought its own sheeting and that there was no way to distinguish

it from the Debtor's sheeting.  AP-ECF No. 277, p. 245.  She further acknowledged that

the sheeting she used to determine the 32 cents per pound price was 50 pound

sheeting, and the Debtor's sheeting was 41.5 pound sheeting.  AP-ECF No. 278, pp.

19–20.

Alan Jr., on the other hand, claimed that NE Road bought its own sheeting for the

Bridgeport job, and that the testimony to the contrary was not accurate.  AP-ECF No.

279, p. 116.  In addition, Helen testified and submitted into evidence the ledger she kept

of the materials purchased for the Bridgeport job, including what she stated were

several purchases of sheeting, totaling $82,051.46.  AP-ECF No. 366, pp. 59-60, Exh.

122.  Helen conceded that she did not know if the sheeting listed in the ledger was the

only sheeting used on the Bridgeport job.  AP-ECF No. 366, p. 132.

---

[39]     Kim earlier testified that sheeting degrades each time it is used, but could be reused "quite a few
times."  AP-ECF No. 277, p. 134.

The third significant group of supplies allegedly used by NE Road were barriers. Kim testified that the Debtor had 30 concrete barriers.  AP-ECF No. 277, p. 159.  Kim photographed what she asserted were some of the Debtor's barriers on the Killingworth job.  AP-ECF No. 277, p. 158, Exh. NN.  Of greater import, for the Marlborough Project, Kim testified regarding a "Material Certificate" filed with the State by Helen.  AP-ECF No. 277, p. 160.  It stated that concrete barriers were being used at the site, and listed the past projects where they had been used, which Kim testified were the Debtor's projects.  AP-ECF No. 277, p. 160, Exh. OO.  An inventory list faxed by Alan Jr. to the Trustee on December 28, 1995 (the "Neri Inventory List,") listed the concrete barriers, but only as "some pieces", with an uncertain location.  AP-ECF No. 277, pp. 161-62, Exh. MM.

In addition, Kim testified regarding the State's project records for the Branford Job, which showed that Alan Jr. requested $1,139.50 in payment for NE Road's use of a concrete curing box.  AP-ECF No. 277, pp. 155–56, Exh. LL.  The Neri Inventory List included a concrete curing box at the Trumbull Job site.  AP-ECF No. 277, pp. 156–57; Exh. MM.  Kim also testified that NE Road used the Debtor's job trailers and storage trailers and never paid the Debtor.  AP-ECF No. 105.

Alan Jr. confirmed that NE Road used the Debtor's delineators, job trailer, concrete curing box, and storage trailer, and stated that NE Road may have used the Debtor's construction barricades and concrete forms, but did not list any of the supplies in the Equipment Use Spreadsheets.  AP-ECF No. 278, pp. 236–238.  He maintained that NE Road did not use the Debtor's sheeting or sand inertial barriers.  AP-ECF No. 278, p. 236.  He also stated that the Debtor had barriers and signs in the yard, Alan Sr.

47

didn't consider the barriers equipment, and Alan Jr. had used the barriers on some NE Road jobs without paying.  AP-ECF No. 279, pp. 96–97.

### *The Debtor/C&A Development Default on Premises Rental from Shoreline*

The Trustee also presented evidence that the Defendants used their control of the Debtor to default on the lease for the 35 Lumberyard Property, make NE Road the leaseholder, and evict C&A Development.  As previously stated, C&A Development, owned equally by Carl and Alan Sr., had entered into a lease-purchase agreement on the 35 Lumberyard Property with Shoreline.  AP-ECF No. 281, pp. 111–12 (Carl's testimony).  C&A paid $1,000 in rent per month, and rented the 35 Lumberyard Property to the Debtor for $3,500.  *Id.*, Exh. G.  Following the entry of the 1992 TRO, the Debtor was to pay the sum of $500 per month in rent for the Rear Building and Neri Corp. was to pay $500 per month in rent for the Front Building directly to Shoreline.  Exh. 19.  Carl testified that at a certain point Gerald Bugg, the president of Shoreline, told him that Alan Sr. had stopped paying the rent on behalf of the Debtor.  AP-ECF No. 281, p. 123. This statement was not admitted for the fact that Alan Sr. had actually stopped.  AP-ECF No. 281, pp. 122–23.  Carl testified that he offered to pay the Debtor's share as well, but Bugg refused to accept it.  AP-ECF No. 281, p. 123.  Shoreline terminated C&A's lease and purchase agreement on August 1, 1994, for non-payment of rent.  AP-ECF No. 281, p. 124, Exh. H, Exh. I.

On July 30, 1994, Alan Jr. on behalf of NE Road entered into an "Agreement to Purchase" the 35 Lumberyard Property from Shoreline for $200,000.00.  Exh. J.  NE Road's ledger reflects a $1,000.00 per month credit in rent against obligations owed to the Debtor, commencing with a December 30, 1994 entry for September, October, November, and December of 1994.  The credit entries continue February 28, 1996, with

48

a final rent credit through July of 1996.  Exh. 60.  In contrast, NE Road paid $250.00 to

the Debtor for rent for the months of February and March of 1993, and another $350.00

for April and May of 1993, according to checks and deposit tickets submitted into

evidence by the Trustee.  Exh. MMMMMM, LLLLLL.

Gerald Bugg testified that he did not recall Carl offering to pay Alan's half of the

rent.  AP-ECF No. 283, p. 125.  The Schedule of Rent Payments maintained by

Shoreline showed $500 in rent due from Carl for February through June 1994, and

payments by Alan Sr. of $500 for February through July 1994.  Exh. 118.  The letter

sent by Bugg to Carl and Alan Sr. terminating the lease stated that $1,000 of rent and

$1,920.30 in taxes were due, which is inconsistent with the Schedule of Rent Payments

showing $2,000 due.  Exh. 118.

The evidence is not clear as to whether Carl failed to pay the rent or whether, as

the Trustee argues, Bugg and Alan Sr. conspired to manufacture a default to sell to NE

Road.  It is, however, clear that after acquiring the property, NE Road charged the

Debtor four times the rent that the Debtor had previously charged to NE Road.

### *The Debtor Files for Bankruptcy*

As previously described, Alan Sr. signed the voluntary Chapter 11 bankruptcy

petition that commenced this case on January 17, 1995.  After the Chapter 11 case

commenced, the Debtor continued to rent its equipment to NE Road.  According to the

Equipment Use Analysis, the Killingworth job began in June of 1994 and did not finish

until July of 1996, spanning the Petition Date.  Exh. UUUUU.  The Branford, Essex, and

Trumbull Projects were all entirely post-petition projects.  The Branford Project ran from

August 1995 through July 1996; the Essex Project ran from April to July 1995; and the

Trumbull Project ran from April 1995 through June 1996.  Exh. RRRRR, QQQQQ,

VVVVV.  The Debtor as debtor in possession did not move for authorization to enter into

these post-petition rental agreements pursuant to 11 U.S.C. § 363 (b); the Defendants

contend they were not required to because the rental agreements were ordinary course

of business transactions.  Carl filed a motion to appoint a chapter 11 trustee on March

14, 1995, and following an evidentiary hearing Trustee Sibarium was appointed Chapter

11 trustee on October 31, 1995.  AP-ECF No. 29, 89.

### *The Auction*

Trustee Sibarium conducted an Auction of the Debtor's equipment on July 13,

1996.  Alan Jr. testified that he helped set the Auction up on behalf of the Debtor, and

that NE Road had an agreement that it would be compensated for the use of the 35

Lumberyard Property for the Auction.  He stated that the auctioneer, Sam Piotrkowski,

and Trustee Sibarium, told him that NE Road would be compensated in the amount of

$30,000.  AP-ECF No. 283, pp. 88–89.  He said he and other NE Road personnel

moved "stuff" out of the way, cleaned up, got the equipment ready and made repairs.

AP-ECF No. 283, pp. 89–90.  Trustee Sibarium testified during a deposition admitted

into evidence that initially Alan Jr. and he had discussed having the Auction at the 35

Lumberyard Property.  Later, "they" did not want the Auction held "on-site."  The matter

was resolved in conjunction with ongoing settlement discussions that subsequently fell

through and the Auction was held at the 35 Lumberyard Property.  Exh. 61, p. 15.  He

acknowledged that having the Auction at the 35 Lumberyard Property saved the estate

$20,000.00 to $30,000.00, and that Piotrkowski retained some "people from the Alan

Neri group" to help.  Trustee Sibarium testified Piotrkowski had included "them" – the

people from the Alan Neri group – in his Affidavit of Expenses.  Exh. 61, pp.14-15.  Kim

testified that they, NE Road's employees, left the equipment dirty so NE Road could try

50

to purchase it at a better price.  AP-ECF No. 283, p. 195.  Piotrkowski testified that on a scale of poor, fair, good, very good, and excellent, the equipment he auctioned was in fair condition.  AP-ECF No. 366, p. 82.  He also testified that he and Trustee Sibarium discussed moving the equipment to Piotrkowski's yard, but he encouraged Trustee Sibarium not to move the equipment because of the moving cost.  AP-ECF No. 366, p. 83.  None of the parties asked Piotrkowski about any agreement to pay NE Road for use of the 35 Lumberyard Property during the auction process.  AP-ECF No. 366, pp. 79-85.  Piotrkowski did testify that the property on which the Auction took place overlapped "both tenants."  AP-ECF No. 366, p. 83.

The gross proceeds from the Auction totaled $341,915.00.  Exh. W.  Piotrkowski filed an Auctioneer's Report of Sale and Affidavit of Expenses on behalf of Petrowsky Auctioneers in the main case on September 18, 1996, and subsequently amended it on October 1, 1996.  AP-ECF Nos. 141, 153.  The final report was entered into evidence as Exhibit W (the "Auctioneer's Report").  The Auctioneer's Report listed expenses of $26,193.85 and the auctioneer's commission of $11,713.30.  Exh. W.  The expenses included three categories of expenses: Transportation, Preparation & Miscellaneous, Labor Expenses, and Advertising Expenses.  Exh. W.  The Transportation, Preparation & Miscellaneous expense category included items for moving equipment, rental of the Connecticut Water Service parking lot, and toilet rental.  Exh. W.  Six individuals were listed in the Labor Expenses category, and their time sheets were provided.  Exh. W.  Alan Jr. was  not listed, none of the individuals listed were identified as NE Road employees, and there was no rental charge for the 35 Lumberyard Road Property.  Exh. W.

51

## EVIDENTIARY RULINGS

### *The DeMaria Deposition*

As noted earlier, the Court authorized a trial deposition of Anthony DeMaria, who

was suffering from advanced Parkinson's disease and unable to be examined in the

courtroom.  The deposition was conducted on September 16, 2010, and the parties

stipulated to the entry of the deposition transcript as a trial exhibit (the "DeMaria

Deposition," Exh. 150), with evidentiary objections made during the deposition to be

decided in the Court's final decision.  During the deposition, the Trustee objected to the

admission of portions of the 1999 deposition transcript of DeMaria (the "1999 Transcript

Excerpts"), Exhibit 84[40], which the Defendants attempted to read into the record, and to

the admission of two documents, Exhibits 62 and 80.  The Trustee objected to

admission of the 1999 Transcript Excerpts on hearsay grounds, and to Exhibits 62 and

80 on hearsay and authentication grounds.  Exh. 150, pp. 15-24 (Exh. 80), 26-32 (Exh.

62, 84); *see also* AP-ECF No. 296, pp. 67-71, AP-ECF No. 299, pp. 13-15.  The

Defendants contend that the 1999 Transcript Excerpts are admissible as a prior

inconsistent statement, and that Exhibits 62 and 80 were properly authenticated and

admissible under the business records exception to the hearsay rule.  AP-ECF Nos.

292, pp. 21-22; 298, pp. 24-28.[41]

---

[40]     The trial transcript for May 11, 2010, AP-ECF No. 277, taken literally indicates that Exhibit 84 (the 1999 Transcript) was admitted as a full exhibit on the first day of trial.  The Court infers, however, from the context of page 32 (particularly lines 13 to 24) as well as the parties' post-trial briefing that Exhibit 84 was not intended to be admitted by stipulation.  The Court therefore treats it as marked for identification only, leaving the evidentiary dispute to be decided.
[41]     In AP-ECF No. 322, Defendants also assert that the 1999 Transcript should be admissible because DeMaria was unavailable during the 2010 deposition because he could not remember the content of the 1999 Transcript and therefore was unavailable as a witness.  The Trustee asserts that making a new argument six years after briefing concluded is improper.  AP-ECF No. 327, p. 2.  Considering the argument on its merits, the Court concludes the argument is overbroad as explained below.

The Second Circuit Court of Appeals held in *U.S. v. Insana*, 423 F.2d 1165,

1169-1170 (2d Cir. 1970) that when a recalcitrant witness falsifies a lack of memory, the

court may in its discretion admit prior statements for their truth, but when a witness "in

good faith asserts that he cannot remember the relevant events . . . the trial court may,

in its discretion, exclude the prior testimony." *See also U.S. v. DeSimone*, 488 F.3d

561, 571-72 (2nd Cir. 2007).  There is no evidence suggesting that DeMaria was

recalcitrant or falsely attested to a lack of memory.  Aside from special cases such as

that dealt with in *Insana*, "[p]rior inconsistent statements are not offered for their truth,

but rather to demonstrate the witness's lack of credibility." *United States v. Mergen*, 764

F.3d 199, 207 (2d Cir. 2014).  Therefore, the 1999 Transcript Excerpts could be used to

impeach DeMaria's testimony, but were not admissible for their truth.

When shown Exhibit 62 in 2010, DeMaria testified that the writing on it belonged

to Jackie Smith, his assistant who ran the administrative component of the bonding

program, but that he had no definitive knowledge of whether it was in the Debtor's file at

his company.  Exh. 150, pp. 11, 26.  DeMaria also testified that notes like it were kept in

the regular course of his business, but did not know when the note was made, and after

being shown Exhibit 80, stated that it did not refresh his recollection as to when Exhibit

62 was made.  Exh. 150, pp. 29-31.  The Defendants therefore failed to satisfy

Fed.R.Evid. 803(6) and 901 as to Exhibit 62.

When shown Exhibit 80 in 2010, DeMaria testified that he recognized the

handwriting as belonging to Jackie Smith.  AP-ECF No. 150, p. 16.  He also testified

that the form was one used to request information in the regular course of business

activities and that the business practice was to record dates contemporaneously with

the event being recorded.  AP-ECF No. 150, pp. 16–18.  On *voire dire* by the Trustee,

DeMaria stated that while it was not signed, it was not imperative that documents like it

be signed.  AP-ECF No. 150, p. 18.  He also testified that documents of its type were

kept and used to keep track of the information Bogina & DeMaria Incorporated asked

bonding clients for and when.  AP-ECF No. 150, pp. 23–24.  DeMaria's testimony

established that Exhibit 80 was of a type that his company used, that contained

information recorded contemporaneously with the event being recorded and that was

used to record requests made to clients.  While DeMaria was unable to recall the

specific document, the Court concludes that DeMaria's recognition of his assistant,

Jackie Smith's, handwriting together with his other testimony are sufficient to satisfy

Fed.R.Evid. 803(6) and 901 as to Exhibit 80.

Based on this record, the Court sustains the Trustee's objections to the

admission of the portions of the 1999 Deposition read during the DeMaria Deposition

and to the admission of Exhibit 62.  The Court overrules the Trustee's objection to the

admission of Exhibit 80 and admits Exhibit 80 as a full exhibit.

## **DISCUSSION**

### ***Counts I and II: Overview of Constructive and Intentional Fraudulent Transfers***

The first two counts of the complaint allege constructive and intentional

fraudulent transfers by virtue of leases of construction equipment from the Debtor to NE

Road.  The Trustee relies on §§ 544(b) and 548 of the Bankruptcy Code, and the

Connecticut Uniform Fraudulent Transfer Act (UFTA), Conn.Gen.Stat. §§ 52-552e, 52-

552f, and 52-552h.

The Trustee bears the burden of proof as the party alleging a fraudulent transfer

or conveyance and must prove the elements by clear and convincing evidence.  *Certain*

*Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 394–95, 957 A.2d 836

(2008); *In re Richardson*, 268 B.R. 331, 334 (Bankr. D. Conn. 2001), *aff'd,* Docket No.

3:01-CV-2126-DJS (D. Conn. Sept. 28, 2004); *Jacobowitz v. Jacobowitz*, 102 Conn.

App. 332, 342, 925 A.2d 424 (2007).  If the Trustee meets his burden then the

transferee, NE Road, may avoid liability if it proves that it received the conveyance or

transfer in "good faith" and received "reasonably equivalent value," by a preponderance

of the evidence.  Conn.Gen.Stat. § 52–552i(a).

The Court will enter judgment for the plaintiff Trustee and against NE Road on

Counts I and II because: (1) the short term leases of the Debtor's equipment were

transfers of the Debtor's right in personal property – its possessory interest in its

equipment – without receipt of reasonably equivalent value; (2) the transfers were made

while the Debtor was insolvent or resulted in the insolvency of the Debtor; and (3) the

transfers were made with fraudulent intent on the part of certain insiders of NE Road.

The Bankruptcy Code's definition of "transfer" is extremely broad and includes

"each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of

disposing of or parting with property or an interest in property…." 11 U.S.C. § 101(54).

> The legislative history of this definition confirms its breadth: A transfer is a
> disposition of an interest in property. The definition of transfer is as broad as
> possible. Many of the potentially limiting words in current law are deleted, and
> the language is simplified. Under this definition, any transfer of an interest in
> property is a transfer, including a transfer of possession, custody, or control
> even if there is no transfer of title, because possession, custody, and control
> are interests in property.
> *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (9th Cir. 1996)(quoting
> S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), reprinted in 1978 U.S.C.C.A.N.
> 5787, 5813).

The Trustee asserted in Counts I and II that but for the Debtor's transfer (the

alleged below market rental of the equipment to NE Road), the Debtor could have rented

the equipment at market rates for reasonably equivalent value to others or even to NE

Road.[42]

Section 548 of the Bankruptcy Code allows the trustee to avoid prepetition

transfers as follows:

"(a)(1) The trustee may avoid any transfer  . . . of an interest of the debtor
in property, or any obligation . . . incurred by the debtor, that was made or
incurred on or within 2 years before the date of the filing of the petition, if
the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to
hinder, delay, or defraud any entity to which the debtor was or became, on
or after the date that such transfer was made or such obligation was
incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for
such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such
obligation was incurred, or became insolvent as a result of such transfer or
obligation . . . ."

Section 544(b) of the Bankruptcy Code allows the Trustee to step into the shoes

of a creditor– here the Trustee based his claim on the Debtor's debt to Caciopoli at all

relevant times – and avoid a transfer to the extent it is voidable under applicable law:

"(b)(1) Except as provided in paragraph (2), the trustee may avoid any
transfer of an interest of the debtor in property or any obligation incurred
by the debtor that is voidable under applicable law by a creditor holding an
unsecured claim that is allowable under section 502 of this title or that is
not allowable only under section 502(e) of this title."

The applicable law forming the basis for the Trustee's claims pursuant to 11

U.S.C. § 544(b) is contained in Conn.Gen.Stat. §§ 52-552e, 52-552f, and 52-552h:

"A transfer made or obligation incurred by a debtor is fraudulent as to a
creditor, if the creditor's claim arose before the transfer was made or the

---

[42]    Whether the Trustee eventually sold the equipment at the Auction, thereby transferring title
including all of the rights associated with ownership, is not relevant to the question here.  Here, the Court
must determine if the transfer of the possessory portion of the bundle of rights held by the Debtor was
accomplished in exchange for reasonably equivalent value.

obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor  . . . (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."
Conn.Gen.Stat. § 52-552e(a)(2)(a).

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."
Conn.Gen.Stat. § 52-552f(a).

"(a) In an action for relief against a transfer or obligation under sections 52-552a to 52-552l, inclusive, a creditor, subject to the limitations in section 52-552i, may obtain: (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . ."
Conn.Gen.Stat. § 52-552h.

Avoidance pursuant to the Bankruptcy Code and pursuant to the UFTA are based on the common law concepts of actual and constructive fraudulent transfers, requiring that the Trustee prove either, "(1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations [a constructive fraudulent transfer] or (2) that the conveyance was made with a fraudulent intent in which the grantee participated [an actual fraudulent transfer]. . . . The party seeking to set aside a fraudulent conveyance need not satisfy both of these tests. . . ." *Kosiorek v. Smigelski*, 138 Conn. App. 695, 724, 54 A.3d 564, 582 (2012)(*citing Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 394–95, 957 A.2d 836 (2008)(internal quotation marks omitted)).

"[A]n allegedly fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its

composite implications." *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (Internal quotation marks omitted).

For both Counts I and II, "[o]nce a transfer has been avoided under § 544(b), the extent of recovery remains to be determined.  The governing provision, § 550(a), provides in part that if a transfer is avoided under one of the avoiding powers, "the trustee may recover, for the benefit of the estate," the property transferred or its value." 5 *Collier on Bankruptcy* ¶ 544.06 (16th 2018).

### *Count I. Constructive Fraudulent Transfer*

To prevail on Count 1 the Trustee had to establish (1) that the Debtor received less than a reasonably equivalent value[43] in exchange for the transferred property, and (2) that the debtor was insolvent when the transfer was made.

The Trustee asserted the equipment rentals to NE Road were at below market rates from 1992 to 1996, and that the Debtor was insolvent during this period, resulting in constructively fraudulent transfers totaling $1,086,563.13.  *See*, AP-ECF No. 164; AP-ECF No. 328, Exh. ZZZZZ.  NE Road defended the constructive fraudulent transfer claim by arguing the Debtor was solvent between 1992 and 1995, that Wood made numerous errors in calculating NE Road's use of the Debtor's equipment, that Smith used unsound methods to compute the rent that should have been charged, and that at all times NE Road acted in good faith in all its dealings with the Debtor.  AP-ECF No. 297, pp. 10-11, 24-27.

---

[43]     Substantial consideration pursuant to § 52-552e(a)(2) and reasonably equivalent value are virtually identical.  *See Carney v. Lopez,* 933 F. Supp. 2d 365, 382 (D. Conn. 2013).

A. **Reasonably Equivalent Value**

Whether NE Road provided reasonably equivalent value for its use of the

Debtor's equipment[44] lies at the heart of this dispute.  To determine reasonably

equivalent value, courts consider: "(i) the market value of what was transferred and

received; (ii) whether the transaction took place at arm's length; and (iii) the good faith

of the transferee" *In re Turner & Cook, Inc.*, 507 B.R. 101, 109 (Bankr. D. Vt. 2014).  In

deciding whether a debtor received 'reasonably equivalent value' for an alleged

fraudulent transfer, the court should consider both the direct and indirect benefits

flowing to the debtor as a result of the exchange."  *Id. (citing In re Akanmu*, 502 B.R.

124, 130 (Bankr.E.D.N.Y.2013)).

The Court can readily conclude that Alan Sr., Alan Jr. and NE Road used the

Debtor as a source of equipment and did not make efforts to resuscitate it as a

construction company, or to turn it into a viable commercial equipment rental company.

Further, it is clear that the various equipment rental agreements were not made at arm's

length; the rates charged were arrived at by an informal process among insiders, family

members and affiliated companies with little reference to what the equipment could be

rented for on the open market; and that little effort was made to memorialize the terms

of any rental agreement or to accurately record and bill for the equipment use.  Actually

calculating what the reasonably equivalent value of the equipment rental would have

been in the early to mid-1990s is more difficult.

The Smith Report concluded that the Debtor should have charged $911,477.88,

not accounting for operating costs of 15% to 25% and profit of 15%.  *See* Exh ZZZZZ,

---

[44]     In this and the following discussion of Counts II-IV, the court is considering only the equipment
rental, and is not considering the use of supplies in terms of the value transferred.  Rather, the use of
supplies is considered to the extent it demonstrates the nature of NE Road's use of the Debtor.

AP-ECF No. 296 p. 26, compared with the $206,214.19 actually billed by the Debtor

and the approximately $132,000.00 paid by NE Road.  AP-ECF No. 296 p. 26, Exh. 3-E,

Exh. 124, Exh. ZZZZZ.  NE Road claimed the Debtor charged "roughly" $270,000.00,

which it offset with $140,000.00 in charges, principally equipment rentals and lease

payments to the Debtor, and ultimately paid the remaining $130,000.00.  AP-ECF No.

298, p. 24.  NE Road did not cite a source for these figures.  According to Exhibit R, the

ledger of the Debtor's and NE Road's transactions through April 21, 1995, the total of

"debits" and discounts" was $161,357.55 paid or credited to the Debtor.  But, according

to Exhibit 60, the ledger through February 28, 1996 – the ledger the Trustee claimed

Helen did not timely produce in discovery – the total was $242,778.35.  AP-ECF No.

279, pp. 209–212.

There are at least three methodology issues.  First, whether Wood's method of

tracking equipment use or NE Road's was more reliable.  Second, whether the charges

should have been for "time out" or only "time used" – or, respectively, "active" plus "idle"

time or only "active" time.  Third, whether the rates used by Smith were more indicative

of reasonably equivalent value than those set by the Defendants.  The application

issues include whether Wood accurately tracked NE Road's use of the Debtor's

equipment, whether the Court can rely on NE Road's own tracking of its use, and

whether Smith at times used the wrong Blue Book rates for calculating the Rental

Rates.

In order to track equipment use, the Debtor relied on NE Road's foremen to

manually record the use of equipment.  These foreman's logs were supposedly lost in a

flood, and the initial hand written Equipment Use Spreadsheets are likewise missing.

Wood compared the State's Inspection Reports with the Auction List in order to create

60

the Equipment Use Analyses.  Each method has its own weaknesses.  NE Road's

foremen would have an incentive to record less equipment use than occurred.  While

the State inspectors did not prepare the Inspection Reports for billing purposes.  The

distinction between whether a machine was counted as active or idle depended on

whether it was in use when the State inspector performed the inspection.  This is not a

significant weakness, though, for two reasons.  First, this would create a bias toward

marking equipment idle.  Second, Smith charged on a "time out" basis, therefore the

distinction between active and idle was unimportant.

Smith claimed that "time out" was the standard used in the rental industry, for the

simple reason that while a piece of equipment is on a job site, it cannot be rented to

anyone else.  AP-ECF No. 282, p. 76.  For this reason, he made no distinction between

whether a piece of equipment was active or idle, counting all time an equipment was on

the job site as active, billable, time.  Alan Jr., on the other hand, asserted that "time

used" was appropriate in this situation, because the Debtor could use the equipment

itself at any time and the Debtor was not in the rental business.  AP-ECF No. 279, pp.

86–87.  Therefore, NE Road did not track idle time, and tracked active time by the hour,

rather than by the day, with some exceptions discussed below.

Based on the Court's calculations, 40% of the time included by Smith as billable

is idle time.[45]  Assuming idle time was spread evenly among the different pieces of

equipment, this amounts to approximately $364,591.15.  Smith testified that time out

was the standard in the rental business, but Alan Jr. asserted that it would have made

no sense to move equipment back to the Lumberyard when it would just sit idle there.

---

[45]      NE Road asserted that the Trustee used 4,429 active days and 2,566 idle days, for 36.6% idle
time.  See AP-ECF No. 298, p. 21.  The Court concludes that the Trustee used 4,389 active days and
2,901 idle days, for 40% idle time.

In addition, had Alan Jr. known NE Road would be charged for equipment sitting idle at a job site, he might have taken it back to the Lumberyard, depending on the cost of doing so and the amount of anticipated idle time.  In addition, he might have planned to use the equipment in a different manner, such as performing as much work with it as possible in a short time period, thereby reducing the amount of idle time.

This speculation as to what could have happened demonstrates a weakness in the Trustee's analysis.  NE Road's use of the equipment was premised on the manner in which the Debtor would bill it.  A *post hoc* analysis based on what should have been charged neglects the possibility that if NE Road was renting equipment on a time out, rather than time used basis, it would have acted differently.  It may not have rented from the Debtor at all if the Debtor was charging on a time out basis.

The testimony by Casler regarding his business's practice of permitting contractors to take their equipment out of the rental agreement leads the Court to chart a middle ground on this issue.  Applying the time out methodology appears draconian if other rental companies permit renters to keep property without paying rent due to specified circumstances.  At the same time, the Debtor's practice of only billing for actual time used does not appear to be commercially reasonable.  The Court concludes that if the rental agreements had been negotiated at arm's length, they would have been largely on a time-out basis, but exceptions could have been negotiated for extended periods during which work was not performed but the equipment stayed on site.  Having reviewed the Equipment Use Analyses and noted that some pieces of equipment were idle for significant periods of time while others were used regularly, while not every day, the Court concludes that a 50%, or $182,295.58 reduction in the amount of idle time billed is appropriate.

62

Both parties argued that the rates they used were more indicative of reasonably equivalent value for the equipment rentals.  The Court can readily conclude that Alan Jr. misused the Form 814 because the section he used to calculate rental rates is intended for subsidiaries of the contractor and the Debtor was not a subsidiary of NE Road.  In addition, Alan Jr.'s use of an hourly rate derived from the Blue Book monthly rate clearly benefitted NE Road to the Debtor's detriment.  Finally, the difference between the rates charged to NE Road and those charged to the Debtor demonstrate that the rates negotiated between Alan Sr. and Alan Jr. [46] were set for NE Road's benefit.

On the other hand, the Court is skeptical of Smith's assertion that older equipment could be rented at the same rate as new equipment.  AP-ECF No. 282, pp. 108-110.  On this point, Alan Jr.'s testimony that older machines can't dig as much, are slow, and break down more frequently appears more credible than Smith's testimony that old equipment could be rented for the same price as new.  AP-ECF No. 366, p. 150.  This does not lead the Court to conclude that the rates themselves used by Smith were incorrect, but rather suggests that the Court should – at most -- use the lower end of the additional 15% to 25% operating costs and 15% profit requested by the Trustee.

---

[46]     The Supreme Court considered the meaning of the term "reasonably equivalent value" in the context of a foreclosure sale and concluded that fair market value, or even a price calculated as a percentage of fair market value, was not indicative of "reasonably equivalent value" in a foreclosure sale.. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545–46, 114 S. Ct. 1757, 1765, 128 L. Ed. 2d 556 (1994). Rather,"'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the state's foreclosure law have been complied with." The Court in *BFP Resolution* stressed that only foreclosure sales complying with applicable state law have this conclusive force.  Here, the negotiations between Alan Sr. and Alan Jr. contain none of the safeguards present in foreclosure sales that would justify accepting their negotiated values.  *See In re Smith*, 811 F.3d 228, 234 (7th Cir.), cert. denied *sub nom. Smith v. SIPI, LLC*, 137 S. Ct. 103, 196 L. Ed. 2d 40 (2016) (declining to extend *BFP v. Resolution Trust Corp.* to Illinois tax sales which "do not involve competitive bidding where the highest bid wins"); *In re Jacobson*, 523 B.R. 13, 14 (Bankr. D. Conn. 2014) ("tax sale conducted in accordance with Conn. Gen. Stat. § 12–155 et seq. . . . conclusively establishes as a matter of law 'reasonably equivalent value'").

The errors in implementation were of several types.  The Equipment Use Analyses classified some pieces of equipment as belonging to the Debtor when the evidence available to Wood was ambiguous or even contradictory to this conclusion. Wood did not have a list of NE Road's equipment, and the descriptions in the Inspector's Reports were occasionally generic.  On the other hand, NE Road did not have underlying documents supporting its Equipment Use Spreadsheets.  In addition, Smith was unable at some points during his testimony to state where the rates he used were contained in the Blue Book.

The discrepancies in the Equipment Use Analyses elicited by the Defendants demonstrate that Wood was predisposed to concluding that equipment belonged to the Debtor.  The Trustee asserted that these inconsistencies are a natural byproduct of the methods of tracking equipment Wood was forced to use due to the Debtor's and NE Road's poor record keeping.  AP-ECF No. 296, pp. 71–72.  He further argued that the combined inconsistencies amount to $5,917.03.  The Trustee claims that this amount is negligible, and that any under-billing between the Debtor and NE Road would have offset it.  The Defendants, on the other hand, contend that the discrepancies they have shown demonstrate that the Court should not credit Wood's Equipment Use Analyses. AP-ECF No. 300, p. 4.  The Inspector Reports used by Wood were voluminous, and only the Inspector Reports used by the Defendants to demonstrate discrepancies or ambiguities are available to the Court.  The Court therefore cannot confirm whether the Defendants have isolated all of the inconsistencies or ambiguities or whether similar inconsistencies or ambiguities run throughout the Equipment Use Analyses.

The burden of proof is on the Trustee to demonstrate by clear and convincing evidence that the Rental Agreements were not for reasonably equivalent value.  The

64

Court concludes that the Trustee has done so, in that there is clear and convincing evidence that the amount billed by NE Road was significantly less than reasonably equivalent value.  The discrepancies illustrated by the Defendant are not sufficient for the Court to overlook the significant under-billing revealed by the Plaintiff's evidence. While the Court cannot precisely quantify the amount that the discrepancies would have reduced the amount billed, it concludes that the Defendants likely highlighted the most egregious examples and demonstrated $5,917.03 in discrepancies.  Out of consideration for the possibility that there are further discrepancies, the Court will reduce the amount by a further $10,000.00, for a total of $15,917.03.  After that, it will add the lower amount suggested by Smith for operating costs, (fifteen (15%) percent) and the amount suggested for profit (fifteen (15%) percent).  AP-ECF No. 282, pp. 79-80, pp. 87-88.  Finally, the Court must determine whether to reduce it by the cash NE Road paid ($132,000.00) or by one of the amounts taking both payments and credits into account, $161,357.66 pursuant to Exhibit R; $242,778.35 pursuant to Exhibit 60; or $270,000.00 pursuant to the Defendants' assertion.  The $242,778.35 figure was contained in a document that was not timely disclosed, but was extensively discussed at trial.  Moreover, some of the discounts, such as the $1,000.00 rent appear to have not been charged in good faith.  Without the $1,000.00 rent, Exhibit R shows $226,778.35 in payments or credits.  The Court believes that the $242,778.35 figure is most accurate.

The Court therefore calculates the reasonably equivalent value transferred to NE Road as a result of the rental agreements between it and the Debtor as follows:

| | |
|---|---|
| Smith Adjusted Billing: | $911,477.88 |
| Reduction of ½ Idle time: | ($182,295.58) |
| Reduction due to Inconsistencies: | ($15,917.03) |

| | |
|---|---|
| Subtotal: | $713,265.27 |
| Plus 30% (operating costs and profit) | $215,754.69 |
| Minus NE Road credited: | ($242,778.35) |
| Total | $686,241.61 |

## B. Insolvency

The second element is insolvency, which the Bankruptcy Code defines as:

"[F]inancial condition such that the sum of such entity's debts is greater than all of such

entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32). The UFTA utilizes the

Bankruptcy Code's definition, and a second definition: "A debtor who is generally not

paying his debts as they become due is presumed to be insolvent." Conn. Gen. Stat. §

52-552c. *Certain Underwriters at Lloyd's, London*, 289 Conn. at 394–95. Additionally,

"[c]ontingent claims of an entity, including pending lawsuits, should be included in the

insolvency calculation." *In re Turner & Cook, Inc.*, 507 B.R. at 109 (*citing e.g., In re

Sierra Steel, Inc.,* 96 B.R. 275, 279 (9th Cir. BAP 1989); *In re Tronox Incorporated,* 503

B.R. 239, 313 (Bankr.S.D.N.Y.2013); *Collier on Bankruptcy*, Sixteenth Ed. ¶ 101.32[5]).

Having determined that $686,241.61 was transferred out of the Debtor during the

period from 1992 to 1996, the Court must now consider whether the Debtor was

insolvent from 1992 onwards. The debt to Caciopoli – which accounted for a substantial

portion of the Debtor's total indebtedness and was not owed to a Neri family member –

steadily rose over the period[47]. AP-ECF No. 296, pp. 38-39; Exh. K. The Neri family

members' salaries were admittedly roughly equal to the Debtor's gross revenues in

1993 and 1994. AP-ECF No. 278, pp. 115–116. Taking these factors into account and

considering that the Debtor's revenue was dependent in large measure on equipment

---

[47]        The debt to Dominic Caciopoli was $245,494 on December 31, 1992, $265,088 on December 31, 1993, and $286,126 in December 21, 1994.

rental to NE Road rather than new construction activity for its own benefit, the Court

concludes that the Debtor was insolvent during the period from 1992 through the filing

of the voluntary Chapter 11 bankruptcy petition in 1995, and until the cessation of

business activity in 1996.  AP-ECF No. 296, pp. 38-39.

The Trustee having met the presumption of insolvency by clear and convincing

evidence, NE Road's reference to the Debtor's books and records alone are insufficient

to rebut the presumption.  AP-ECF No. 10–11.  NE Road's claim that the Debtor was

solvent contradicted the Defendants' repeated theme that the Debtor was on life support

and dependent on rental income provided by NE Road for its survival.  *See* AP-ECF No.

279, p. 90; AP-ECF No. 297, p. 20.

### C. <u>Good Faith Defense</u>

Finally, none of the evidence suggests that NE Road was a good-faith transferee.

The principals of NE Road were either also the principals of the Debtor directing the

transfers or, in Helen's case, were closely related to the Debtor's principals.  There was

no evidence of arm's length bargaining or careful documentation that would suggest NE

Road's good faith.  The 1992 TRO authorized rental from the Debtor to other entities

owned in whole or in part by Alan Sr., but stated that these rentals were to be at fair

market value.  The Court concludes that NE Road did not rent equipment from the

Debtor at a reasonably equivalent value, nor at a fair market value.  The state court's

authorization in the 1992 TRO does not (nor could) demonstrate the state court's

approval for the transactions as they actually occurred.

Based on the preceding analysis, the Court concludes that transfers from the

Debtor to NE Road in the form of equipment rentals at rates that were not commercially

reasonable and did not provide the Debtor with reasonably equivalent value were

constructively fraudulent.  During the period from May 4, 1992, when the 1992 TRO

issued, to July 13, 1996, when the Auction was held, the underpayment by NE Road to

the Debtor totaled $686,241.61, and judgment on Count I will enter in that amount

against NE Road.

### Count II:  Intentional Fraudulent Transfer

The legal standards for an intentional fraudulent transfer under the Bankruptcy

Code or the UFTA require proof of fraudulent intent with "actual intent to hinder, delay,

or defraud" a creditor on the part of the transferor, here the Debtor.  *See* 11 U.S.C. §

548, Conn.Gen.Stat. § 52-552e(a)(2)(a), *Nat'l Council on Comp. Ins., Inc. v. Caro &*

*Graifman, P.C.*, No. CIV 3:00-CV-1925 AHN, 2008 WL 450413, at *1 (D. Conn. Feb. 15,

2008)(holding that intent pursuant to the UFTA "is based solely on the transferor's

intent"); *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005)(same

pursuant to §548(a)(1)(A)).

"[T]he determination of the question of fraudulent intent is clearly an issue of fact

which must often be inferred from surrounding circumstances. . . .  Such a fact is, then,

not ordinarily proven by direct evidence, but rather, by inference from other facts

proven—the indicia or badges of fraud." *Wieselman v. Hoeniger*, 103 Conn. App. 591,

600, 930 A.2d 768, 773 (2007) (Citations omitted, internal quotation marks omitted.).

Courts often look to the non-exclusive list of factors set forth in Conn. Gen. Stat. Stat. §

52-552e, as have both parties to this case.[48]  *See Wieselman*, 103 Conn. App. at 600;

AP-ECF No. 296, p. 32, AP-ECF No. 297, p. 13.  Pursuant to Conn.Gen.Stat. § 52-

---

[48]    Federal courts have used a substantially similar list in analyzing § 548.  *See In re Actrade Fin.*
*Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005)(*citing HBE Leasing Corp. v. Frank*, 48 F.3d 623,
639 (2d Cir.1995)); *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir.1983).

552e, "(b) [i]n determining actual intent under subdivision (1) of subsection (a) of this

section, consideration may be given, among other factors, to whether:

> "(1) The transfer or obligation was to an insider,
> (2) the debtor retained possession or control of the property transferred
> after the transfer,
> (3) the transfer or obligation was disclosed or concealed,
> (4) before the transfer was made or obligation was incurred, the debtor
> had been sued or threatened with suit,
> (5) the transfer was of substantially all the debtor's assets,
> (6) the debtor absconded,
> (7) the debtor removed or concealed assets,
> (8) the value of the consideration received by the debtor was reasonably
> equivalent to the value of the asset transferred or the amount of the
> obligation incurred,
> (9) the debtor was insolvent or became insolvent shortly after the transfer
> was made or the obligation was incurred,
> (10) the transfer occurred shortly before or shortly after a substantial debt
> was incurred, and
> (11) the debtor transferred the essential assets of the business to a lienor
> who transferred the assets to an insider of the debtor."

All of the badges of fraud do not need to be satisfied.  Indeed, "that five of the

eleven badges of fraud are present raises a strong presumption of intent to defraud,"

and "other suspicious circumstances present" may be considered.  *The Cadle Co. v.

White*, No. 3:02-CV-00030 TPS, 2006 WL 798900, at *7 (D. Conn. Mar. 21, 2006).

The Trustee's claim against NE Road for intentional fraudulent transfer in Count

II relies on his assertion that not only did NE Road fail to provide reasonably equivalent

value to the Debtor when renting its equipment from 1992 to 1996 (which the Court has

now found in Count I), but the rental transactions were negotiated with fraudulent intent.

The Court's discussion of reasonably equivalent value related to Count I is equally

applicable here.  The remaining question regarding Count II is whether the Trustee

established that the transfers by the Debtor to NE Road for less than reasonably

equivalent value demonstrated an intent to hinder, delay, or defraud creditors.

69

The key touchstone for the Court, as it was for the parties, will be the badges or indicia of fraud set forth in Conn.Gen.Stat. § 52-552e(b), some of which are either clearly applicable or clearly inapplicable. The familial relations among the directors of both companies demonstrate that the criterion set forth in § 52-552e(b)(1) – that the transfer was to an insider – is met here. The Court has already determined that the transfers were not for reasonably equivalent value and that the Debtor was insolvent at the time they were made, satisfying §§ 52-552e(b)(8) and (9). Neither party claims that §§ 52-552e(b)(6), (7), or (11) are applicable. *See* AP-ECF No. 296, p. 41; AP-ECF No. 297, p. 14.

The parties discussed § 52-552e(b)(4), whether the Debtor was sued before or threatened before the transfer, and § 52-552e(b)(10), whether the transfer occurred shortly before or after a substantial debt was incurred. The debt to Caciopoli and the suit Alan Sr. brought in 1992 are relevant to these criteria, but the Court does not find the timing indicative of fraud. Caciopoli's debt gradually increased over time, the Debtor did not incur the debt at a specific time. Similarly, while the state court lawsuit by Alan Sr. against Carl was brought at a specific time in 1992, the rentals took place from 1992 through 1995, rather than occurring as an immediate transaction directly after the lawsuit was brought. At the same time, the presence of a lawsuit and mounting debt raise an inference of fraudulent intent.

NE Road asserted that § 52-552e(b)(2) – whether the Debtor retained possession or control of the property transferred – and § 52-552e(b)(5) – whether substantially all of the Debtor's assets were transferred – demonstrate a lack of fraudulent intent. NE Road reasoned that because the Debtor could have used the equipment rented by NE Road at any time, the Debtor retained possession and control.

70

Similarly, they argued that none of the assets were physically transferred nor was substantially all of the equipment leased at any one time. First, while Alan Jr. testified that the Debtor could have used its equipment at any time, he did not reference any situation where a piece of equipment was taken off a NE Road job site in order to perform work for the Debtor. AP-ECF No. 366, p. 157. The significant expanses of idle time also suggest that the Debtor did not have possession or exercise control over the equipment while it was at a NE Road site. Finally, while the equipment itself was not transferred to NE Road permanently or all used at the same time, the evidence showed that NE Road rented the Debtor's equipment far more than any other party.

NE Road asserted that because Kim testified she saw the Debtor's equipment being used by NE Road and there was no evidence that the Debtor's logos on the equipment were obscured or removed, the transfers were not concealed pursuant to §52-552e(b)(3). Attorney Doyle testified for the Trustee that neither he nor Carl knew about the potential rental agreements between the Debtor and NE Road when the 1992 TRO was entered, or for years thereafter. In addition, the lack of any direct reference to NE Road in the 1992 TRO, the transcript of the 1992 TRO agreement, or the Control Decision suggests that the Defendants were not forthcoming regarding the existence of NE Road. Exh. 19, 20, 21. Finally, that Kim and Carl at some point knew that NE Road was using the Debtor's equipment does not mean they were aware of the nature of the transactions and this line of defense by NE Road ignores the reality that Alan Sr. was in charge of the Debtor during the relevant period, not Carl.

The manner in which the Debtor charged NE Road is a key component of the transfers. The Equipment Sign-Out Sheets, which were only provided to Carl until December of 1992 or January of 1993, did not have the actual rate information on

71

them.[49]  Exh. P; AP-ECF No. 277, pp. 97-98.  The difference between the rates quoted

to Carl and the rates charged to NE Road also demonstrate that the Defendants

concealed the nature of the transactions.

The Court concludes that the various badges of fraud taken as a whole

demonstrate that fraudulent intent by the renter (the Debtor acting through Alan Sr.) and

the rentee (NE Road acting through Alan Jr.) animated the rental agreements.  This

conclusion is bolstered by the evidence of NE Road's use of the Debtor's supplies

without paying for them.  While use of supplies is not a component of damages for this

Count, the manner in which NE Road used the Debtor's supplies without any

agreement, payment, or record keeping demonstrates that the Defendants were

transferring assets out of the Debtor so that the assets could not be reached by

creditors.  The Court's examination of the entire record leads it to the conclusion that

NE Road used the assets of the Debtor, a heavily indebted company in which Carl –

from whom Alan Sr. and Alan Jr. were estranged -- still held an interest, to bolster NE

Road, a new corporation Alan Sr., Alan Jr. and their immediate family members created

without the debt burden of the Debtor and without Carl having any interest.  NE Road is

therefore liable for the amount it gained at the Debtor's expense.

The damages calculation applicable to Count I for a Constructive Fraudulent

Transfer is equally applicable to Count II for an Intentional Fraudulent Transfer.

Therefore, the damages for this Count II are the same amount, or $686,241.61, and a

judgment in that amount will enter against NE Road.

---

[49]      As stated earlier, the Equipment Sign-Out Sheets did state the dates when equipment was taken
and returned, and set out the terms in general terms.  Rental was to be billed at the Blue Book rate
pursuant to Form 814, and only for the time the equipment was actually used.

### *Count III: Unauthorized Post-Petition Transfers*

In Count III, the Trustee alleged a claim against NE Road for unauthorized post-petition transfers pursuant to 11 U.S.C. § 549(a).  Bankruptcy Code § 549(a) provides, "the trustee may avoid a transfer of property of the estate – (1) that occurs after the commencement of the case; and (2) . . . (B) that is not authorized under this title or by the court."

Pursuant to Fed.R.Bankr.P. 6001, "[a]ny entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof."  *See also* 5 *Collier on Bankruptcy* ¶ 549.07 (16th 2018).  This Rule has been interpreted by bankruptcy courts as setting up a burden shifting paradigm:  "As the party seeking to set aside the post-petition transfers, the Trustee bears the initial burden of proof by a preponderance of the evidence. . . .  Once the Trustee makes this initial showing, the burden then shifts to the entity asserting the validity of the transfer to prove the validity of the transfer by a preponderance of the evidence."  *In re Louis Gherlone Excavating, Inc.*, No. 10-31517 JAM, 2014 WL 7246146, at *4 (Bankr.D.Conn. Dec. 19, 2014); *In re Affinity Health Care, Mgmt., Inc.*, 499 B.R. 246, 263 (Bankr.D.Conn. 2013); *In re Countryside Manor, Inc.*, 239 B.R. 443, 446 (Bankr.D.Conn.1999).

Pursuant to 11 U.S.C. §1107, a debtor in chapter 11 – which the Debtor was prior to Trustee Sibarium's appointment – "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  In Count III, the Trustee complained the Debtor leased equipment to NE Road without authorization during the

73

Chapter 11 phase of the Main Case, and thus NE Road should be required to pay damages.

The term "ordinary course of business" generally has been accepted "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business. . . . Although never specifically articulated by [the Second Circuit], two tests have emerged to determine whether a transaction is 'ordinary.' These tests are (1) the 'creditor's expectation test' also known as the 'vertical test,' and (2) the 'industry-wide test' also called the 'horizontal test.' . . . Under this two-part analysis, [t]he touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. . . . Under the vertical test, the court views the disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to enter into a contract with the debtor. . . . The horizontal test involves an industry-wide perspective in which the debtor's business is compared to other like businesses. In this comparison, the test is whether the post-petition transaction is of a type that other similar businesses would engage in as ordinary business." *In re Lavigne*, 114 F.3d 379, 384–85 (2d Cir. 1997), *see also In re Fairfield Sentry Ltd.*, 539 B.R. 658, 675 (Bankr. S.D.N.Y. 2015), *subsequently aff'd*, No. 16-2127-BK, 2017 WL 2258282 (2d Cir. 2017)(summary order).

"The purpose behind the ordinary course of business rule in § 363 is to allow a business to continue its daily operations without incurring the burden of obtaining court approval or notifying creditors for minor transactions, while at the same time protecting secured creditors and others from the dissipation of the estate's assets." *In re Enron*

74

*Corp.,* Docket No. 01-16034 (AJG), 2003 Bankr. LEXIS 2111, at *55-56 (Bankr.

S.D.N.Y. Mar. 21, 2003). "[T]ransactions of a type that the debtor commonly engaged

in, or which the debtor might have reasonably been expected to engage in prepetition,

are likely to be within the ordinary course of business after the commencement of a

case, whether or not common in the debtor's industry." 3-363 *Collier on Bankruptcy* ¶

363.03 (16th ed. 2017).

Here, the Trustee claimed that NE Road's use of the Debtor's equipment on the

Branford and Trumbull jobs[50] for no "more than a nominal amount," were voidable

pursuant to 11 U.S.C. §§ 540(a)(1) and (2)(B) because they were not within the ordinary

course of business pursuant to 11 U.S.C. § 363(C)(1), and therefore were not

authorized by the Bankruptcy Code. NE Road objected to the Trustee's

characterization of the amount paid as nominal, but did not otherwise argue that the

rentals were within the ordinary course of the Debtor's business. AP-ECF No. 298, pp.

13-14.

The Trustee claimed that the Debtor charged NE Road only $1,258.02 for the

Branford job and $2,221.41 for the Trumbull job, whereas pursuant to the Smith Report

they should have billed $56,397.00 and $68,921.70, respectively. The Trustee also

added an additional $19,298.30 and $23,345.13 for operating costs and profit of 35%.

NE Road asserted that the amount actually charged was $16,134.60 for Trumbull and

$5,614.96 for Branford according to the NE Road Ledger. Exh. 60; AP-ECF No. 298, p.

14. The Branford job contained equipment use of 121 hours of active time and 266

hours of idle time. Exh. RRRRR. The Trumbull job contained equipment use of 505

---

[50]      The Essex job also took place post-petition, but the Trustee does not include it in Count III.

hours of active time and 9 hours of idle time.  Exh. RRRRR.  Smith's billing for idle time

therefore does not account for the significant difference between his numbers and NE

Road's.  The reason for the difference is either that Wood's and Smith's methodologies

resulted in significant overbilling, or that for these latter jobs when the Debtor was

already in bankruptcy, NE Road decided to increase its under-billing.

The Court is not convinced by the Trustee's argument that because the

Defendants under-billed the Debtor, these equipment rentals were outside of the

Debtor's regular business practice.  The standard for whether a transaction is in the

ordinary course looks at the type of transaction.  *See In re Lavigne*, 114 F.3d at 384–85.

The Trustee's claims center around whether the transaction is unreasonable from a

business judgment perspective.  This is the provenance of a fraudulent transfer analysis

with the higher standard of proof that entails, rather than a claim for an unauthorized

post-petition transfer.  The Court concludes that the Trustee has failed to demonstrate

that a construction company renting out its equipment is not outside of the expectations

of creditors or unusual in the construction industry.

On Count III, the Court finds for NE Road and against the Trustee.

### *Count IV: Unjust Enrichment*

The Trustee alleged a claim for unjust enrichment against NE Road in Count IV,

relying on a common law equitable doctrine for which the law of Connecticut controls.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its

basis being that in a given situation it is contrary to equity and good conscience for one

to retain a benefit which has come to him at the expense of another . . .  Plaintiffs

seeking recovery for unjust enrichment must prove (1) that the defendants were

benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and

(3) that the failure of payment was to the plaintiffs' detriment." *Town of New Hartford v. Connecticut Resources Recovery Authority*, 291 Conn. 433, 451-52 (2009).  "It is often said that an express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter. . . .   Nevertheless, when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Id.* at 454-455 (citations omitted).

The burden of proof for unjust enrichment falls on the Trustee, who must demonstrate the elements by a preponderance of the evidence. *See The Cadle Co. v. Jones*, Docket No. 3:00-CV-316-WWE, 2014 WL 2049321 (D. Conn. Aug. 20, 2004).

In Count IV, the Trustee sought to recover for unjust enrichment based on the rental agreements.  The damages sought are the same as for Counts I and II, but the Court's analysis will also take into account the whole course of the parties' dealings.  In addition, an unjust enrichment claim cannot be made where there is a contract.

The Defendants did not raise the existence of an express contract as an affirmative defense, nor did they brief it in their initial briefing in December of 2011 and January of 2012.  AP-ECF Nos.  297, 298, 299.  Instead, the existence of an express contract that would prevent application of the doctrine of unjust enrichment was first raised in the Defendants' supplemental memorandum of law filed in response to the Court's request for a damages analysis from the plaintiff and a response thereto by the Defendants.  *Compare*, AP-ECF Nos.  297, 298, 299 and AP-ECF No. 352, pp. 37-38. Based on this record, the Court concludes that the Defendants failed to properly raise this defense and therefore waived it.  *See*, *Krys v. Sugrue (In re REFCO Inc.)*, Docket No. 07-MDL 1902 (JSR), 2009 U.S. Dist. LEXIS 134692, at *72 n.6 (S.D.N.Y. Nov. 20, 2009); *Ansell v. D'Alesio,* 485 F.Supp.2d 80, 86 (D.Conn. 2007) (stating that where the

77

plaintiffs did not address their equal protection claim in their opposition, "the Court will

deem Plaintiffs to have waived their equal protection claim."); *Lami v. Stahl*, No.

3:05CV1416 (MRK), 2007 WL 3124834, at *1 (D.Conn. October 25, 2007) (concluding

the court was fully justified in finding that Ms. Lami had waived her retaliation claim

when she failed to include it in summary judgment briefs); *Desiderio v. Celebrity Cruise*

*Lines, Inc.*, 1999 WL 440775, *3 (S.D.N.Y.1999) (finding claim abandoned where

plaintiff's post-trial submissions included no proposed findings of fact or conclusions of

law on such claim).  In addition, the Court concludes that, if considered, the agreement

between NE Road and the Debtor was too indefinite to be considered an express

contract and would be voidable as self-dealing if it were.

Pursuant to the discussion of Counts I and II, the Court has already addressed

whether the rental agreements were fundamentally fair and determined they were not.

The Court has also determined that NE Road was benefitted unjustly, that NE Road did

not pay a reasonable equivalent value for the rentals and that the failure to pay the

Debtor was to the Debtor's detriment.  Several additional considerations are relevant

here, given the broader nature of the Court's consideration of an unjust enrichment

claim.  These are the Crane Lease, NE Road's use of the Debtor's supplies, and the

default on the 35 Lumberyard Property lease.

Taken as a whole, these three considerations reinforce the Court's decision that

the rental agreements were not in the Debtor's best interest.  Without concluding

whether the Crane Lease terms were more beneficial to the Debtor or NE Road, the

careful manner in which the Defendants drew up the lease demonstrates greater

attention to the rights of NE Road than to the rights of the Debtor.  NE Road's use of the

Debtor supplies clearly demonstrates that the Defendants were obtaining other benefits,

in addition to the rental of the equipment, without paying.  Finally, NE Road's decision to double the Debtor's rental rate after it purchased the 35 Lumberyard Property demonstrates another attempt to extract value from the Debtor.  The complaint alleged that NE Road was benefitted, "[b]y virtue of the rental of the Machinery and Equipment", therefore the additional benefit obtained by NE Road as a result of its use of the supplies and its raising of the 35 Lumberyard Property rent are not a component of the damages for this Count, but they are relevant to the determination that retention of the benefits that are alleged would be unjust.

The Court finds for the Trustee on Count IV regarding the benefit unjustly retained by NE Road as a result of the equipment rentals, in the amount of $686,241.61 as calculated in Count I.  The Trustee also sought damages in this count for the improper diversion of corporate opportunities as alleged in Count V and that is addressed below.  Judgment will enter against NE Road on Count IV in the amount of $686,241.61.

### Count V: Improper Diversion of Corporate Opportunities

In Count V, the Trustee alleged a claim for improper diversion (or usurpation) of corporate opportunities against NE Road, Alan Sr., Alan Jr., and John.  The theory behind a claim of usurpation of a corporate opportunity stems from the idea that "[i]f a corporate officer is presented with a business opportunity that the corporation is financially able to undertake, is in line with its business and is one in which the corporation has an interest or expectancy, the self-interest of the officer will be brought into conflict with the interest of the corporation and the law will not permit him to seize the opportunity for himself." *Murphy v. Wakelee*, 247 Conn. 396, 404, 721 A.2d 1181 (1998).

79

"To prevail on a claim of usurpation … [the] plaintiff bears the burden of establishing [by a preponderance of the evidence]: (1) a fiduciary relationship between the corporation and the alleged wrongdoers; and (2) the existence of a corporate opportunity." *Murphy*, 247 Conn. at 404 (*citing Ostrowski v. Avery*, 243 Conn. 355, 362, 703 A.2d 117 (1997).[51] "An officer and director occupies a fiduciary relationship to the corporation and its stockholders." *Katz Corp. v. T H. Canty & Co.*, 168 Conn. 201, 207, 362 A.2d 975 (1975).

"[W]hether a corporate opportunity exists is a 'factual question to be decided by reasonable inferences from objective facts.'" *Ostrowski*, 243 Conn. at 365 (*citing Guth v. Loft, Inc.*, 23 Del. Ch. 255, 5 A.2d 503 (1939)). To determine whether a corporate opportunity exists, courts apply "[t]he avowed business purpose test … a variant of the 'line of business' test, one of the leading tests of corporate opportunity." *Ostrowski*, 243 Conn. at 366. "This test asks whether the opportunity is 'closely associated with the existing and prospective activities of the corporation . . . .'" *Ostrowski*, 243 Conn. at 366. Factors to consider include:

> (1) whether the business opportunity was one in which the complaining corporation had an interest or an expectancy growing out of an existing contractual right;
> (2) whether there was a close relationship between the opportunity and the corporation's business purposes and current activities; and
> (3) whether the business areas contemplated by the opportunity were readily adaptable to the corporation's existing business, in light of its fundamental knowledge, practical experience, facilities, equipment, and personnel.
> *Ostrowski*, 243 Conn. at 366.

---

[51] "While *Ostrowski* does not explicitly state the standard of proof required of a plaintiff as to its initial burden, it is clear, by implication, that such standard is the default civil standard of a 'preponderance of the evidence'. Th[e] Court must logically assume that the Connecticut Supreme Court would not specify the higher 'clear and convincing' standard only for the defendant's burden if in fact that standard applied to both the plaintiff and defendant." *In re Tripodi*, 313 B.R. 358, 362 (Bankr. D. Conn. 2004).

"[T]here can be no expectancy in a transaction unless the corporation is financially able to undertake it." *Ostrowski*, 243 Conn. at 374 (*citing Katz Corp.*, 168 Conn. at 210).

Once a plaintiff establishes the relationship and the corporate opportunity, the burden then shifts to the fiduciaries to establish, by clear and convincing evidence, the fairness of their dealings with the corporation. *Murphy*, 247 Conn. at 404 (*citing Ostrowski*, 243 Conn. at 362. "[A]dequate disclosure of a corporate opportunity is an absolute defense to fiduciary liability for alleged usurpation of such a corporate opportunity." *Ostrowski*, 243 Conn. at 376-77. In *Ostrowski*, the defendants disclosed the existence of the opportunity to the majority shareholder, but the disclosure was inadequate because the defendant failed to disclose the opportunity to the minority shareholders. *Ostrowski*, 243 Conn. at 371. "In the absence of such disclosures, corporate fiduciaries like the present defendants must prove [by clear and convincing evidence] that, in light of the relevant circumstances … they did not deprive the corporation of an opportunity that the corporation could have pursued." *Ostrowski*, 243 Conn. at 377.

"[I]t is the corporate fiduciary, not the complainant, who must establish, as an affirmative defense, that the corporation lacked the financial ability to avail itself of a corporate opportunity." *Ostrowski*, 243 Conn. at 366 n.9; *see also, Plainville Electrical Products Co. v. Michaud*, X03CV 970482505S, 2000 Conn. Super. LEXIS 1717, at *27 (Super. June 30, 2000).

In Count V, the Trustee asserted that NE Road, Alan Sr., Alan Jr., and John usurped nine (9) specific corporate opportunities[52] by bidding on, and winning,

---

[52]     The nine (9) State and municipal construction projects included projects located in Groton, Clinton, Marlborough, Bridgeport (2 jobs), Essex, Trumbull, Branford, and Killingworth.

81

construction projects for NE Road that were within the Debtor's avowed business purpose.  The Trustee sought damages equal to the gross profits realized by NE Road totaling $1,486,811.00 as reported on NE Road's accountant's review reports, Exhibit GGGGG.  *See* AP-ECF No. 296, p. 33.

It is undisputed and uncontested that Alan Sr., Alan Jr., and John were fiduciaries of the Debtor by virtue of their roles: Alan Sr. and John were directors of the Debtor and Alan Jr. was vice president of the Debtor after April 1, 1992.  AP-ECF No. 297, pp. 5–6; AP-ECF No. 298, p. 3.  However, the Trustee failed to establish that NE Road stands in a fiduciary relationship with the Debtor.  Accordingly, the Trustee's claim in Count V against NE Road fails.  Additionally, the Court notes that the record is devoid of any evidence that John specifically engaged in the alleged usurpation of the Debtor's corporate opportunity.  Rather, the conduct of Alan Sr. and Alan Jr. appears to drive the actions of both the Debtor and NE Road during this time.  Notwithstanding that John is a fiduciary of the Debtor, due to the lack of evidence of conduct by John that usurped the Debtor's corporate opportunity, the Court concludes the Trustee has failed to meet his burden and finds in favor of John as to Count V.

The Trustee asserted that the nine (9) State and municipal construction projects NE Road performed were of the same type that the Debtor performed prior to the entry of the 1992 TRO, and were of the type the Debtor had expertise in, and, of course, possessed equipment to perform.  AP-ECF No. 296, p. 50.  To support this contention the Trustee points to the Debtor's Certificate of Incorporation that indicated the Debtor's business purpose was "to carry on a general contracting, construction and excavating business …. ."  AP-ECF No. 296, p. 50.  No evidence was presented suggesting that NE Road was not also in the same business of general contracting and construction.  In fact,

the evidence suggests that NE Road was purposely established to do the exact same business as the Debtor because, among other reasons, the Debtor could not obtain the bonding required to bid on new projects.  AP-ECF No. 366, pp. 106-108.  The Court also notes that the CON-16 statement submitted by NE Road relied heavily upon the Debtor's personnel and experience.  *See* Exh. SSS; AP-ECF No. 281, pp. 106-107.  The Court concludes that the nine (9) State and municipal construction projects were closely associated with the existing and prospective activities of the Debtor.  Accordingly, the nine (9) State and municipal construction projects were corporate opportunities of the Debtor.

Alan Sr. and Alan Jr.'s argument that the nine (9) State and municipal construction projects were not within the Debtor's avowed business purpose because the Debtor could not get bonding fails.  The lack of an ability to obtain bonding goes to the Debtor's financial ability to take advantage of the corporate opportunity, not to whether the opportunity is within the Debtor's avowed business purpose.  The Debtor's financial inability to obtain bonding in order to take advantage of this opportunity is an affirmative defense that Alan Sr. and Alan Jr. must prove by clear and convincing evidence.  The Trustee asserted that because they did not plead affirmative defenses of financial inability, adequate disclosure, or fairness, they waived the ability to do so.  The Court need not determine whether a waiver occurred because even if Alan Sr. and Alan Jr. had not waived their ability to claim lack of financial ability (bonding) and fair dealing, they have failed to meet their burden to prove such defenses by clear and convincing evidence.

Alan Sr. and Alan Jr.'s claims that the Debtor lacked the ability to obtain bonding are self-serving.  Specifically, the Defendants point to Carl and Kim's testimony that Neri

Corp. was formed because the Debtor was at its bonding limit as evidence that the Defendants had no choice but rent equipment to NE Road and pursue work NE Road would do with the Debtor's equipment because the Debtor was unbondable. The Court interprets this testimony to indicate that the Debtor was at its limit at that time. But nothing in the record suggests that the bonding capacity was fixed and that when certain jobs for which the Debtor already had bonding were completed, the Debtor would not then have the capacity to obtain bonding for other jobs. Additionally, as previously noted, Alan Sr. was the president of the Debtor and Alan Jr. served as vice president. The evidence suggests that they used their positions to all but obstruct any attempt by the Debtor to obtain bonding. They were the ones who could have directed the Debtor to seek or apply for bonding but instead, they made little or no attempt to obtain bonding or to overcome the obstacles faced by the Debtor in obtaining bonding. Rather, the record indicates that Alan Sr. and Alan Jr. allowed NE Road to bid, perform, and profit from the nine (9) State and municipal construction projects at the expense of the Debtor. Accordingly, the Court concludes that Alan Sr. and Alan Jr. have not met their burden of demonstrating that the Debtor was unable to avail itself of the corporate opportunities by clear and convincing evidence.

Thus, the Court concludes the Trustee established that Alan Sr. and Alan Jr. usurped the corporate opportunities of the Debtor. Judgment will enter against Alan Sr. and Alan Jr. on Count IV in the amount of One Million, Four Hundred Eighty-Six Thousand, Eight Hundred and Eleven ($1,486,811.00) Dollars.

### Count VI: Breach of Fiduciary Duty

The Trustee alleged a claim for breach of fiduciary duty against Alan Sr., Alan Jr., and John in Count VI on behalf of the bankruptcy estate. *Pereira v. Farace*, 413 F.3d

84

330, 342 (2d Cir. 2005); *Cohen v. Singer*, 4 F. App'x 38, 40 (2d Cir. 2001). The Trustee

must therefore prove by a preponderance of the evidence: "(1) That a fiduciary

relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant

to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests

of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in

any matter relating to the plaintiff; (2) That the defendant advanced his or her own

interests to the detriment of the plaintiff; (3) That the plaintiff sustained damages; (4)

That the damages were proximately caused by the fiduciary's breach of his or her

fiduciary duty." *Culhane v. Culhane*, 969 F. Supp. 2d 210, 224–25 (D. Conn. 2013); *see*

*also*, *Eastburn v. Imagineers, LLC,* No. CV-13-6039189-S, 2016 WL 3179488, at *5

(Conn. Super. Ct. May 13, 2016); *Stone v. Pattis*, Connecticut Superior Court, Docket

No. CV-09-5011515-S, 2013 WL 2383595, at *6 (May 9, 2013); *Stedman v. Stedman*,

No. CV-10-6008073-S, 2012 WL 6122487, at *3 (Conn. Super. Ct. November 14, 2012).

"[T]he determination of whether a [fiduciary] duty exists between individuals is a

question of law." *Biller Associates v. Peterken*, 269 Conn. 716, 721, 849 A.2d 847

(2004)(Internal quotation marks omitted). "[A]n officer and director occupies a fiduciary

relationship to the corporation and its stockholders." *Ostrowski*, 243 Conn. at 363.

Just as in usurpation of a corporate opportunity, "once a plaintiff establishes the

existence of a fiduciary duty, the burden shifts to the corporate fiduciary to prove fair

dealing by clear and convincing evidence. . . . [I]f a director of a corporation enters into

a transaction with the corporation that will inure to his or her individual benefit, the

director bears the burden of proving that the transaction is fair, in good faith and for

adequate consideration." *Ostrowski*, 243 Conn. at 362. Diverting an opportunity to

another business in which the fiduciary has a substantial interest qualifies as self-

85

dealing. *Ostrowski*, 243 Conn. at 356, 364; *Curley* v. *Brignoli Curley & Roberts Associates*, 746 F. Supp. 1208, 1217 (S.D.N.Y. 1989).

Here, the Trustee alleged in Count VI that Alan Sr., Alan Jr., and John breached their respective fiduciary duties to the Debtor by, "causing or permitting [the Debtor] to allow NE Road to use [the Debtor's] Machinery and Equipment for less than a reasonable rental charge . . . ." AP-ECF No. 164, p. 9. Each of the *Culhane* elements have been established as to defendants Alan Sr. and Alan Jr., but not as to John. *Culhane*, 969 F. Supp.2d at 224–25.

There was a fiduciary relationship between the Debtor and each of Alan Sr., Alan Jr. and John due to their status as the three directors of the Debtor, and their status as three of the four shareholders of the Debtor. Moreover, the Defendants admit that Alan Sr., Alan Jr., and John were fiduciaries of the Debtor. AP-ECF No. 297, pp. 5–6. As described earlier in this decision, the Court concludes that the Trustee established that equipment rentals from the Debtor to NE Road were charged at less than fair market rates, and that this was for the advantage of NE Road. NE Road was a company with which each of Alan Sr., Alan Jr. and John were affiliated, and from which each stood to benefit directly. The terms and conditions of the equipment rentals were negotiated by Alan Sr. and Alan Jr., with little or no evidence of John's role in the equipment rental activities having been presented. By renting to NE Road at less than a fair price, Alan Sr. and Alan Jr. enriched NE Road, and by extension themselves. As to damages, as noted in the discussion relating to earlier Counts, the Trustee has established the below-market-rentals of equipment from the Debtor to NE Road caused damages to the Debtor and the self-dealt rental agreements were the proximate cause of the damages itemized in the discussion of Count I, earlier in this decision.

86

Based on the record here, the Court concludes the defendants Alan Sr. and Alan Jr. breached their respective fiduciary duties to the Debtor and failed to meet their burden to establish fair dealing as a defense. Numerous points, including the lack of arm's length negotiation or documentation, the use of the Debtor's supplies for no cost, and the amount charged for the rentals all demonstrate that Alan Sr. and Alan Jr. did not deal fairly with the Debtor.

The Court concludes, however, that the Trustee failed to establish that John played a role in the below-market-rate equipment rental decisions.

Accordingly, judgment will enter against the defendants Alan Sr. and Alan Jr. in the amount of damages established in the discussion regarding Count I, above, or in the amount of $686,241.61.

### Count VII: Disregard of the Corporate Veil

Count VII is not a model of clarity. While the heading in the Third Amended Complaint names Alan Sr., Alan Jr., John, and NE Road, the allegation appears to seek a determination that NE Road is the alter ego of the Debtor. AP-ECF No. 164. In the Trustee's post-trial brief, the Trustee asserts that the Debtor's "corporate fiction should be disregarded and liability imposed on NE Road." AP-ECF No. 296, p. 71. In the Trustee's Supplemental Post-Trial Memorandum addressing damages, the Trustee fails to reference any specific relief or relief sought as to Count VII. "Practically speaking, piercing the corporate veil is a mechanism by which plaintiffs can pursue liability against defendants that are in fact responsible for conduct despite the use of a 'mere shell. . . as an intermediary to perpetuate fraud or promote injustice.'" *Intermed, Inc. v. Alphamedica, Inc.*, Docket No. 3:09-CV-00762 (JCH), 2009 U.S. Dist. LEXIS 118923, at *23 n.4 (D. Conn. Dec. 18, 2009)(*citing Angelo Tomasso, Inc. v Armor Const. & Paving*, 187 Conn.

544, 557, 447 A.2d 406 (1982) (discussing appropriateness of piercing of corporate veil)).

"In a traditional veil piercing case, a litigant 'requests that a court disregard the existence

of a corporate entity so that the litigant can reach the assets of a corporate insider, usually

a majority shareholder.  In a reverse piercing action, however, the claimant seeks to reach

the assets of a corporation or some other business entity . . . to satisfy claims or a

judgment obtained against a corporate insider."  *Commissioner of Environmental*

*Protection v. State Five Industrial Park, Inc.*, 304 Conn. 128, 139, 37 A.3d 724

(2012)(Internal citations omitted).   "In either circumstance, veil piercing is not lightly

imposed."  *Commissioner of Environmental Protection*, 304 Conn. at 139.

> [B]ecause corporate veil piercing is an equitable remedy, it should be granted
> only in the absence of adequate remedies at law. *See Naples v. Keystone
> Building & Development Corp., supra*, 295 Conn. 233; *see also Floyd v. Internal
> Revenue Service, supra*, 151 F.3d 1300; 1 W. Fletcher, Cyclopedia of the Law
> of Private Corporations (1999) § 41.25, p. 604; annot., 2 A.L.R.6th, supra, § 3,
> p. 195.  In the case of a traditional veil pierce, "[w]hen a judgment debtor is a
> corporation, the judgment creditor cannot reach the assets of the individual
> shareholders due to limitations on liability imposed by corporate law"; *Postal
> Instant Press, Inc. v. Kaswa Corp., supra*, 162 Cal. App. 4th 1522; thereby
> justifying the invocation of equity. Conversely, when the judgment debtor is a
> shareholder or other insider, many legal remedies potentially are available to
> reach corporate assets that rightfully should be available for collection,
> including the attachment of the debtor's shares in the corporation, if he or she
> is a shareholder, garnishment of his or her pay from the corporation, if he or
> she is an employee, challenging of his or her transfers of assets to the
> corporation as fraudulent conveyances or illegal conversion, or attribution of
> individual  conduct to the corporation under theories of agency or respondeat
> superior. *See id.*, 1520; *Floyd v. Internal Revenue Service, supra*, 1300. If
> pursued, these remedies may "[obviate] the need for the more drastic remedy
> of corporate disregard." *Floyd v. Internal Revenue Service, supra*, 1300; *see,
> e.g., Owens & Sons, Inc. v. Guastella East, Inc.*, 354 So. 2d 571, 572 (La. App.
> 1977) (finding reverse pierce "an unnecessary and therefore unavailable
> remedy" where judgment creditor could execute on debtors' shares).
> *Commissioner of Environmental Protection*, 304 Conn. at 141-42.

Here, the Trustee fails to identify what liability is sought to be imposed upon NE

Road or why the Court should exercise its equitable discretion to find that NE Road is the

alter ego of the Debtor.   Additionally, the Trustee has failed to show that it lacks an adequate remedy at law.  For these reasons, the Court concludes that judgment on Count VII shall enter against the Trustee.

### *Count VIII: Participation in Breach of Fiduciary Duty*

The Trustee alleges a claim for participation in breach of a fiduciary duty against Alan Jr., John, and Helen in Count VIII.  As the Court has already found that Alan Jr. violated his fiduciary duty to the Debtor in Count VI, and as there is little evidence regarding John, the Court addresses the Trustee's claim against Helen in this Count VIII.  In his briefing, the Trustee sets out the standards for both aiding and abetting a breach of fiduciary duty and, in the alternative, participating in a civil conspiracy, and focuses his argument solely on Helen, the only non-director of the Debtor among the individual Defendants.[53]  He asserted that Helen is liable to the Debtor's bankruptcy estate for the profits realized by NE Road, totaling $1,486,811.00.

The Connecticut Supreme Court has yet to determine whether aiding and abetting a breach of a fiduciary duty is a viable cause of action in Connecticut. However, the Connecticut Supreme Court has cited the following test twice in *dicta* for the elements of an aiding-abetting cause of action as, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [her] role as part of an overall illegal or tortious activity at the time that [she] provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation...."  *Flannery v. Singer Asset Fin. Co., LLC*,

---

[53]    This is likely because the Alan Jr. and John are the subject of Count VI, for breach of fiduciary duty, the underlying tort the Trustee claims Helen aided and abetted; "individuals cannot aid and abet themselves."  *Master-Halco, Inc. v. Scillia Dowling & Natarelli, LLC*, 739 F. Supp. 2d 109, 121 (D. Conn. 2010).

312 Conn. 286, 334, 94 A.3d 553, 582 (2014)(*citing Halberstam v. Welch,* 705 F.2d

472, 477 (D.C.Cir.1983)); *Efthimiou v. Smith*, 268 Conn. 499, 505, 846 A.2d 222, 226

(2004).

Similarly, the Connecticut Supreme Court has not determined the burden of proof

in this kind of cause of action, but other derivative claims utilize the burden of proof of

the direct claim.  *See Efthimiou*, 268 Conn. at 504–505 (aiding and abetting a breach of

fiduciary duty is a derivative claim); *Master-Halco, Inc. v. Scillia Dowling & Natarelli,*

*LLC*, 739 F. Supp. 2d 109, 117 (D. Conn. 2010) (civil conspiracy premised on fraud

must, like fraud, be proven by clear and convincing evidence).  The direct claim here,

however, involves a burden shift based on the fiduciary relationship.  The rationale for

the burden shift is lost where there is no fiduciary relationship.  For this reason, the

Court concludes that the approach adopted by Delaware state courts, that "[f]or an

aiding and abetting claim . . . the burden of proof rests with the plaintiffs" is the correct

one.  *In re Rural Metro Corp.*, 88 A.3d 54, 84–85 (Del. Ch. 2014), *decision clarified on*

*denial of reargument sub nom. In re Rural Metro Corp. Stockholders Litig.* (Del. Ch.

Mar. 19, 2014).  The same rationale and conclusion hold true for a civil conspiracy to

commit a breach of fiduciary duty. [54]

Proof of the existence of a civil conspiracy requires:  (1) a combination between

two or more persons, (2) to do a criminal or an unlawful act or a lawful act by unlawful

---

[54]        The court will subsequently address whether a claim of civil conspiracy to commit a breach of
fiduciary duty is viable in this case.  Pursuant to New York and Delaware law,"[i]n order to sustain an
allegation of civil conspiracy that involves a conspiracy to breach a fiduciary duty, all members of the
alleged conspiracy must independently owe a fiduciary duty to the plaintiff.'"  *Briarpatch Ltd. L.P. v.*
*Geisler Roberdeau, Inc.*, No. 99 Civ. 9623, 2007 WL 1040809, at *26, 2007 U.S. Dist. LEXIS 27001, at
*78 (S.D.N.Y. April 4, 2007) (*quoting* Pope v. Rice, No. 04 Civ. 4171, 2005 WL 613085, at *13, 2005 U.S.
Dist. LEXIS 4011, at *13 (S.D.N.Y. March 14, 2005))."  *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F.
Supp. 2d 601, 611 (S.D.N.Y. 2011).  The case cited by the Trustee, *Chapman Lumber, Inc. v. Tager*, 288
Conn. 69, 100 (2008), does not involve a conspiracy to commit a breach of fiduciary duty.  *See* AP-ECF
No. 296, p. 66.

means, (3) an act done by one or more of the conspirators pursuant to the scheme and in the furtherance of the object, (4) which act results in damage to the plaintiff.  *See Chapman Lumber, Inc. v. Tager*, 288 Conn. 69, 100, 952 A. 2d 1, 23 (2008).  For civil conspiracy, the Trustee must prove Helen agreed to assist in the breach of fiduciary duty, whereas for aider-abettor liability the Trustee must prove Helen gave substantial assistance with the knowledge—or reckless indifference to the possibility—that the assistance would aid  breach of fiduciary duty.  *See Master-Halco, Inc.*, 739 F. Supp. 2d at 121.

Helen was the bookkeeper for both the Debtor and NE Road and she was the president of NE Road.  Aiding and abetting a breach of fiduciary duty requires that the Trustee demonstrate that Helen was "generally aware of [her] role as part of an overall illegal or tortious activity at the time that [she] provide[d] the assistance; [and] (3) the [she] must knowingly and substantially assist the principal violation. . . ."  *See Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 295 n.12 (2014).  To prove that Helen aided and abetted, the Trustee would have to prove that there was an actual agreement to do a criminal or unlawful act by unlawful means, but would only have to prove that an act was done by one of the coconspirators.  *See Master-Halco, Inc.*, 739 F. Supp. 2d at 121; *Chapmean Lumber, Inc.*, 288 Conn. at 23.  Count VIII included a knowledge component that the other counts lack.  The Trustee elicited numerous examples of accounting practices in Helen's books which benefitted NE Road or the individual Defendants at the Debtor's expense.  AP-ECF No. 279, pp. 184-202.  Helen kept the ledgers, and may be as responsible as any of the Defendants for the failure to seek new bonding for the Debtor.  She may have known, when she went to discuss bonding for NE Road, that Alan Sr. and Alan Jr. were not seeking bonding for the Debtor.  However,

91

there was insufficient evidence that she knew the rental rate was for less than

reasonably equivalent value.  In addition, the Court cannot say that she was generally

aware that NE Road was acquiring jobs that the Debtor otherwise could have bid on

and performed.  Therefore, the Court finds for the Defendants on this count and

judgment will enter against the plaintiff for Count VIII.

### *Counterclaim for Administrative Expense*

NE Road asserts that it should be allowed an administrative expense pursuant to

11 U.S.C. §§ 503(b)(1) and 503(b)(3)(D).  Section 503(b)(1) of the Bankruptcy Code

provides that "[a]fter notice and a hearing, there shall be allowed administrative

expenses . . . including-- (1)(A) the actual, necessary costs and expenses of preserving

the estate . . . ."  Section 503(b)(3) provides that an administrative expense shall be

allowed for "(3) the actual, necessary expenses . . . incurred by-- . . . . (D) a creditor . . .

in making a substantial contribution in a case under chapter 9 or 11 of this title . . . ." NE

Road bears the burden of proof for its counterclaim for an administrative expense and

must demonstrate by a preponderance of the evidence that it has made a substantial

contribution in the case." *See In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y.

2008) (citing additional cases); *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir.

2007)("[t]he burden of proving entitlement to priority payment as an administrative

expense . . . rests with the party requesting it.).

"Because the presumption in bankruptcy cases is that the debtor's limited

resources will be equally distributed among his creditors, statutory priorities are

narrowly construed. . . .  [A]n expense is administrative only if it arises out of a

transaction between the creditor and the bankrupt's trustee or debtor in possession, and

only to the extent that the consideration supporting the claimant's right to payment was

92

both supplied to and beneficial to the debtor-in-possession in the operation of the

business." *In re Bethlehem Steel Corp.*, at 172 (Citations omitted, internal quotation

marks omitted).

"Courts in the Second Circuit use a two-part test to determine whether a specific

claim qualifies as an administrative expense under § 503(b)(1)(A): first, there must be a

post-petition transaction, making it a transaction between the debtor-in-possession and

the creditor; and second, the estate must receive a benefit from the transaction. . . .

Accordingly, an expense is administrative only if it arises out of a transaction between

the creditor and the bankrupt's trustee or debtor in possession . . . . Moreover, the

services performed by the claimant must have been 'induced' by the debtor-in-

possession, not the pre-petition debtor. . . .  A benefit to the debtor-in-possession alone

is not sufficient to warrant entitlement to an administrative claim priority as it would be

contrary to this policy reason for allowing the priority. . . .  In other words, to qualify for

administrative priority, a debtor's obligation to make a payment must have arisen out of

a post-petition transaction between the creditor and the debtor." *In re Grubb & Ellis Co.*,

478 B.R. 622, 624-25 (Bankr. S.D.N.Y. 2012).

Bankruptcy Code § 503(b)(3)(D) "focuses on process as much as on

contribution, on the movant's substantial contribution in the case -- that is, the entire

chapter 11 case -- . . . "compensation under section 503 is reserved for those rare and

extraordinary circumstances when the creditor's involvement truly enhances the

administration of the estate." *In re Bayou Group, LLC*, 431 B.R. 549, 561 (Bankr.

S.D.N.Y. 2010)(citation omitted).  "The majority of cases allowing creditors' substantial

contribution claims under sections 503(b)(3)(D) . . . have  . . . found that the creditor

played a leadership role that normally would be expected of an estate-compensated

professional but was not so performed . . . . the movant's argument is only that it

provided some good or service that enhanced the estate, instead of contributing directly

to the administration of the case, its request would more properly be viewed as one

under section 503(b)(1)(A)"  *In re Bayou Group, LLC*, 431 B.R. at 562–63.

"Factors which the courts have considered in determining whether an applicant

has made a substantial contribution in a chapter 11 case include: whether the services

were provided to benefit the estate itself or all of the parties in the bankruptcy case;

whether the services conferred a direct, significant and demonstrably positive benefit

upon the estate; and whether the services were duplicative of services performed by

others."  *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (citation omitted).

NE Road raised five counterclaims in its answer, but only briefed one, that it

should be allowed an administrative expense pursuant to 11 U.S.C. §§ 503(b)(1) and

503(b)(3)(D).[55]  *See* AP-ECF No. 297.  NE Road's counterclaim arose from Trustee

Sibarium's use of the 35 Lumberyard Property for the Auction of the Debtor's equipment

and for work NE Road did on behalf of the estate to prepare for the Auction and repair

the equipment.  NE Road seeks allowance of an administrative expense of $30,000.00.

Alan Jr. testified that he made an agreement with Piotrkowski, the auctioneer, and the

Chapter 11 Trustee, Trustee Sibarium, that NE Road would be compensated in the

amount of $30,000.00 for having the Auction at the site.  AP-ECF No. 283, pp. 88–89.

The evidence clearly demonstrates that Piotrkowski and Trustee Sibarium

believed that using the 35 Lumberyard Property saved the estate between $20,000.00

---

[55] The Trustee originally claimed that NE Road is not a creditor and therefore cannot rely on § 503(b)(3).  However, after objecting to the NE Road proof of claim number 44-1, the Trustee withdrew his objection.  Therefore the Court need not address this argument.

and $30,000.00. However, neither Piotrkowski in his testimony at trial nor Trustee Sibarium in his deposition testimony stated that there was any agreement. Exh. 61, 14-15; AP-ECF No. 366, p. 83. Trustee Sibarium's testimony indicates that Piotrkowski arranged the Auction and filed an itemized report containing his expenses. Trustee Sibarium also stated that he believed Piotrkowski may have used NE Road personnel and would have included them in his report. Finally, Piotrkowski testified that the Auction occurred on the portion of the 35 Lumberyard Property overlapping both tenants' areas, and Exhibit 60, the NE Road ledger of payments and deductions between NE Road and the Debtor, shows that the Debtor paid $1,000.00 of rent for July 1996, when the Auction occurred. The Court concludes that if there had been an agreement regarding use of the 35 Lumberyard Property, it would have been made with Piotrkowski and the costs thereof would have been included in his report. Exh. W. Therefore NE Road is not entitled to an administrative expense and judgment will enter against NE Road on the counterclaim.

### *Compensatory Damages*

As stated earlier, the Court has concluded that $686,241.61 is a reasonable amount of compensatory damages for the claims related to the rentals, specifically Counts I, II, IV and VI. NE Road, Alan Sr., and Alan Jr. are liable for this amount. As to Count V, the Court has concluded that $1,486,811.00 is a reasonable amount of compensatory damages for the usurpation of corporate opportunities by Alan Sr. and Alan Jr.

***Punitive Damages***

The Court declines to award punitive damages or prejudgment interest.  It
concludes that the evidence did not show wanton or willful and malicious misconduct,
and that prejudgment interest is not equitable in these circumstances.

## CONCLUSION

After trial and careful consideration of the evidence, the testimony presented at
trial, the arguments of the parties, the state and federal law governing the corporate
relationships and responsibilities of the various fiduciaries, officers and directors, and
the creditor-debtor relationships involved in this lengthy dispute, the Court concludes
that judgment will enter against the Defendants on Counts I, II, IV, V and VI, as
summarized in the following table.

| Count | Defendant | Cause of Action | Decision |
|---|---|---|---|
| I | NE Road | Constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b), Conn. Gen. Stat. §§ 52-552e(2) and 52-552f(a) | Judgment against NE Road: **$686,241.61** |
| II | NE Road | Intentional fraudulent transfer pursuant to 11 U.S.C. § 544(b) and Conn. Gen. Stat. § 52-552e(a)(1) | Judgment against NE Road: **$686,241.61** |
| III | NE Road | Unauthorized post-petition transfers pursuant to 11 U.S.C. § 549(a) | Judgment in favor of the Defendants. |
| IV | NE Road | Unjust enrichment | Judgment against NE Road: **$686,241.61** |
| V | NE Road, Alan Sr., Alan Jr., and John | Improper diversion of corporate opportunities | Judgment against Alan Sr. and Alan Jr.: **$1,486,811.00** |
| VI | Alan Sr., Alan Jr., and John | Breach of fiduciary duty | Judgment against Alan Sr. and Alan Jr.: **$686,241.61** |

| VII | Alan Sr., Alan Jr., John and NE Road | Disregard of the corporate veil | Judgment in favor of the Defendants. |
|---|---|---|---|
| VIII | Alan Jr., John, and Helen | Participation in breach of fiduciary duty | Judgment in favor of the Defendants. |

Judgment will enter in favor the Trustee on Counterclaim V.

For the absence of doubt: (1) the amounts awarded to the Plaintiff Trustee in Counts I, II, IV, V and VI are all arising from the same circumstances and transactions, and it is intended the Trustee may recover a maximum of $1,486,811.00 from all Defendants in the aggregate, with the amount assessed in each of Counts I, II, IV and VI intended to be included in the amount assessed in Count V; and, (2) Defendant "Alan Sr." is, pursuant to the substitution of party defendant prior to trial, Helen Neri in her capacity as Executrix of the Estate of Alan Neri. To the extent an argument is not expressly addressed in this lengthy decision, the Court states it has considered all evidence and arguments raised by the parties, and with respect to late-raised claims has considered whether it is equitable to hear them under applicable law and rules. Arguments not discussed have been considered and determined to be without merit.

This is a final decision subject to traditional rights of appeal. Subject to Fed.R.Bankr.P. 8002, a Notice of Appeal must be filed within fourteen (14) days after entry of judgment. In this case, a separate Judgment will enter simultaneously with the entry of this Memorandum of Decision After Trial.

Dated on September 27, 2018, at New Haven, Connecticut.

Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut

97